**Alma F. ANDERSON et al., Plaintiffs,**

v.

**SALT LAKE CITY CORPORATION and Salt Lake County, Utah, Defendants.**

**No. C 10–71.**

United States District Court,
D. Utah, C. D.

Sept. 16, 1972.

Bryce E. Roe, Salt Lake City, Utah, for plaintiffs.

Jack Crellin, and Carl Nemelka, Salt Lake City, Utah, for defendants.

## OPINION

RITTER, Chief Judge.

By action of the Boards of Commissioners of both Salt Lake City and Salt Lake County, a "Ten Commandments" monument was erected on publicly owned land—the court-house grounds close to the front entrance of the "Hall of Justice", where the business of the City and County Courts is conducted, and where all citizens having business with those courts must go to seek justice.

The Eagles, a private fraternal organization, donated the stone monument and paid the expense of erecting it.

The court-house lawns on which it stands are owned by, and maintained at the expense of, the taxpayers. The monument is maintained and repaired, when damaged by vandalism, at the expense of the taxpayers.

And at taxpayers' expense, the defendants installed a light to illuminate the monument so that the inscription can be read at nighttime. And defendants maintain and repair the light at taxpayers' expense.

A stone bench, erected at taxpayers' expense, is located on the public walkway leading to the court-house door. The bench faces the monument which is set two feet from the walkway, so that passersby may sit, and read, and contemplate the message on the graven granite.

The members of both the Salt Lake City and Salt Lake County Commissions were persuaded by the Eagles to authorize the placing of the monument on the front lawn of the Courts Building in full view of the persons entering and leaving the building.

The stone is granite, five feet by three feet, set in cement for permanence, and is of the cleft tombstone shape of common depictions of the tablets bearing the biblical ten commandments.

It is inscribed as follows:

"the TEN COMMANDMENTS

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's."

At the top of the stone, on two tablets in the cleft tombstone shape, is a meaningless jumble of letters in what appears to be an eastern script, to give the illusion of authentic antiquity.

The stone is also engraved with symbols: located between the two tablets at the top of the monument is a triangle with an eye in it—the "All Seeing Eye of God"—a common symbol, in christian religions, which represents the Holy Trinity—the godhead; below the inscription of the commandments, at each corner is a replica of the Star of David, which is a well known Jewish symbol, taking its origin from King David—Christ was of the House of David. And at the very bottom in the center between the two Stars of David is a figure, Christ's monogram, the letter X superimposed upon the letter P, known in the Christian religion as a ChiRho—the first two Greek letters of His name. The monogram is placed at the bottom of the tablet in a position which suggests that it was intended to show Christ's signature to the complete context, (which, indeed, the Eagles say was their purpose, col. 1, lines 45–46, page 1172, infra).

This "Ten Commandments" monument was erected pursuant to what the Lodge calls its "youth guidance program" a long established and continuing program under which these monuments have been placed on public properties across the United States and Canada. The program has been in effect in the State of Utah for about ten years during which nine monuments have been placed in various cities in Utah.

The purposes of the Eagles with regard to that program have been officially set forth in a document produced by the Eagles organization and introduced as evidence by the defendants in this case. That document is entitled, "Suggested Program For Ten Commandments Monolith Dedication", and is quoted here in pertinent part:

"PRELIMINARY ARRANGEMENTS: (Important)

"Contact a prominent member of the Protestant Clergy, Catholic Priest or Bishop and a Jewish Rabbi. Present each one with a copy of the synopsis explaining the Eagles' Ten Commandments program, including the various endorsements of the clergy and other

authorities. Explain to them the selection of the translation appearing on the monolith as well as the symbols appearing thereon:

"We, of the Fraternal Order of Eagles, in searching for a youth guidance program recognized that there can be no better, no more defined program of Youth Guidance, and adult guidance as well, than the laws handed down by God Himself to Moses more than 3000 years ago, which laws have stood unchanged through the years. They are a fundamental part of our lives, the basis of all our laws for living, the foundation of our relationship with our Creator, with our families and with our fellow men. All the concepts we live by—freedom, democracy, justice, honor—are rooted in the Ten Commandments.

"Several years were spent in research and in collaboration with members of the clergy of all denominations, with the result that a Ministerial Association composed of every Protestant church in the community, a catholic Bishop and a Jewish Rabbi, concluded that a translation should be used not identified with any particular faith, but one containing essentially all the Commandments. They were also interested in brevity and a translation that could be easily memorized.

"With the same care symbols were selected to denote such universal acceptance. The All Seeing Eye of God, is one of the oldest religious symbols, used also by a number of lodges and fraternal organizations. The Stars of David recognize our Jewish brethren. Christ was of the House of David and his symbol appears as Chi-Rho, the first Greek letters of His name, in a position denoting the acceptance of these ancient laws of God. This symbol also has the appearance of the superimposed letters P.X., an abbreviation of Pax, meaning peace. The flying Eagle with the American flag is the emblem of our country, as well as the emblem of the Fraternal Order of Eagles.

"We concluded that granite similar in color and texture to that found in the heights of Mt. Sinai, would be more logical and more enduring, since the Commandments were written in fire on the granite of Mt. Sinai.

"The erection of these monoliths is to inspire all who pause to view them, with a renewed respect for the law of God, which is our greatest strength against the forces that threaten our way of life."

The plaintiffs, all residents, citizens and taxpayers of Salt Lake City and Salt Lake County charge in this suit that the erection and maintenance of this monument by action of the Boards of Commissioners of the City and County on public property violate the First and Fourteenth Amendments of the United States Constitution, and Article I, sec. 4 of the Utah Constitution, particularly the Establishment of Religion clause.

They seek a mandatory injunction to compel the removal and to enjoin the erection of the monument.

The law that governs this case is the United States Constitution, Amendment I:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

The First Amendment is the direct descendant of Virginia's Statute of Religious Liberty, of which Thomas Jefferson was the author:

"Well aware that almighty God hath created the mind free; * * * that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrranical; * * *

"*We the General Assembly,* do enact, that no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall he be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer, on account of his religious opinions or belief * * *."

"A Bill for Establishing Religious Freedom", enacted by the General Assembly of Virginia, January 16, 1786. See 1 Randall, The Life of Thomas Jefferson (1858) 219–220; XII Hening's Statutes of Virginia (1823) 84.

The Virginia Statute of Religious Liberty is Document Number 80 in Documents of American History by Henry Steele Commager, 1968.

The Statute is preceded by Commager's excellent sketch of the climactic period of the Virginia struggle for religious liberty which covers the decade 1776–1786 from adoption of the Declaration of Rights to the enactment of the Statute of Religious Freedom:

"The Declaration of Rights of 1776 had announced the principle of religious liberty, but the Anglican Church was still the established church. In 1777 the liberals succeeded in repealing the statutes requiring church attendance and universal support of the established church, but it was not until 1779 that the church was disestablished. Even this was not satisfactory, and Jefferson prepared a bill for absolute religious freedom and equality. This complete divorcement of church and state was bitterly opposed not only by the Episcopal but by the Presbyterian and other dissenting churches as well. The proposal to make all Christian churches state religions on equal standing and support them by taxation found favor with such men as Patrick Henry, Washington, and other conservatives. Jefferson characterized the long struggle for religious freedom as 'the severest contest in which I have ever been engaged', and it was not until 1785 that his bill, sponsored in his absence by Mason, Madison, Taylor, George and W. C. Nicholas, passed the House: in January 1786 it was accepted by the Senate and became law. 'Thus', wrote Madison, 'in Virginia was extinguished forever the ambitious hope of making laws for the human mind', while Jefferson regarded it as one of his three memorable contri-

butions to history. The Bill was translated into French and Italian, and aroused world-wide remark. See, H. J. Eckenrode, *Separation of Church and State in Virginia;* C. F. James, *Documentary History of the Struggle for Religious Liberty in Virginia;* R. B. Semple, *Rise and Progress of Baptists in Virginia;* F. W. Hirst, *Jefferson,* p. 130 ff.; G. Hunt, *Madison;* A. C. McLaughlin, et al., *Source Problems in United States History,* No. 14." *Documents of American History* by Henry Steele Commager 1968.

Madison wrote of Jefferson and the Virginia Statute of Religious Liberty: "This act", he wrote, " * * * was always held by Mr. Jefferson to be one of his best efforts in the Cause of Liberty to which he was devoted. And it is certainly the strongest legal barrier that could be erected against the connection of church and state, so fatal to the liberty of both."

On a stone over Jefferson's grave at Monticello is chiseled the epitaph he himself composed. His instructions for the inscription on his gravestone were that he be known as:

"AUTHOR OF THE DECLARATION OF INDEPENDENCE, OF THE STATUTE OF VIRGINIA FOR RELIGIOUS FREEDOM, AND FATHER OF THE UNIVERSITY OF VIRGINIA."

Here, in words "issuing from the tomb", Jefferson says "by these as testimonials that I have lived, I wish most to be remembered."

Thomas Jefferson, in 1802, wrote a committee of the Danbury (Connecticut) Baptist Association: "I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'Make no law respecting an establishment of religion, or prohibiting the free exercise thereof'; thus building a wall of separation between Church and State."

By the use of his famous figure of speech: " * * * thus building a wall of separation between Church and

State", Jefferson verifies and confirms the inner logic of the establishment clause itself which is absolute and uncompromising—"Congress *shall* make *no law* respecting an establishment of religion * * *."

In probably the most important case in the history of the "establishment clause" of the First Amendment, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), Justice Rutledge wrote a brilliant essay upon the historical background of the First Amendment. He wrote at pages 33-34, 67 S.Ct. at page 520 and on these principles all the Justices agreed:

"No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment. It is at once the refined product and the terse summation of that history. * * * In the documents of the times, particularly of Madison, who was the leader in the Virginia struggle before he became the Amendment's sponsor, but also in the writings of Jefferson and others and in the issues which engendered them is to be found irrefutable confirmation of the Amendment's sweeping content."

Justice Jackson, also, wrote, in *Everson,* supra, 26-27, 67 S.Ct. 516:

"This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity. It was intended not only to keep the states' hands out of religion, but to keep religion's hands off the state, and, above all, to keep bitter religious controversy out of public life by denying to every denomination any advantage from getting control of public policy or the public purse * * *.

"This policy of our Federal Constitution has never been wholly pleasing to most religious groups. They all are quick to invoke its protections; they all are irked when they feel its restraints. * * *

"But we cannot have it both ways. Religious teaching cannot be a private affair when the state seeks to impose regulations which infringe on it indirectly, and a public affair when it comes to taxing citizens of one faith to aid another, or those of no faith to aid all * * *."

Justice Rutledge, continuing his essay, in *Everson,* supra, 32-33, 67 S.Ct. 519, wrote:

" 'Religion' appears only once in the Amendment. But the word governs two prohibitions and governs them alike. It does not have two meanings, one narrow to forbid 'an establishment' and another, much broader, for securing 'the free exercise thereof.' 'Thereof' brings down 'religion' with its entire and exact content, no more and no less, from the first into the second guaranty, so that Congress and now the states are as broadly restricted concerning the one as they are regarding the other.

"No one would claim today that the Amendment is constricted, in 'prohibiting the free exercise' of religion, * * *. It secures all forms of religious expression, creedal, sectarian or nonsectarian, wherever and however taking place, * * *.

"The word connotes the broadest content, determined not by the form or formality of the teaching or where it occurs, but by its essential nature regardless of those details.

" 'Religion' has the same broad significance in the twin prohibition concerning 'an establishment'. The Amendment was not duplicitous. 'Religion' and 'establishment' were not used in any formal or technical sense. The prohibition broadly forbids state support, financial or other, of religion in any guise, form or degree. It outlaws all use of public funds for religious purposes."

James Madison was the author of the First Amendment. His views concerning what is "an establishment of religion" are particularly significant. They are stated in his broadside—his historic *Memorial and Remonstrance Against Religious Assessments.* A copy is attached as an Appendix to this opinion together

with a copy of the bill against which it was directed.

"As the *Remonstrance* discloses throughout, Madison opposed every form and degree of official relation between religion and civil authority."—Rutledge, J., Everson v. Board of Education, 330 U.S. 1, 39, 67 S.Ct. 504, 523 (1947).

"With Jefferson, Madison believed that to tolerate any fragment of establishment would be by so much to perpetuate restraint upon that freedom. Hence he sought to tear out the institution not partially but root and branch, and to bar its return forever"—Rutledge, J., Everson v. Board of Education, supra, 40, 67 S.Ct. 523.

"In no phase was he more unrelentingly absolute than in opposing state support or aid by taxation. Not even 'three pence' contribution was thus to be exacted from any citizen for such a purpose—*Remonstrance*, Par. 3. * * *" Rutledge, J., Everson v. Board of Education, Id. p. 40. The third ground of remonstrance bears repetition here: "Because, it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of the noblest characteristics of the late Revolution.— The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much soon to forget it. Who does not see that * * * the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever? II Madison 183, 185–186."—Rutledge, J., Everson v. Board of Education, supra, 40–41, 67 S.Ct. 523.

"In view of this history no further proof is needed that the Amendment forbids any appropriation, large or small, from public funds to aid or support any and all religious exercises."—Rutledge, J., Everson v. Board of Education, Id. 41, 67 S.Ct. 524.

"This is not therefore just a little case over bus fares. In paraphrase of Madison, distant as it may be in its present form from a complete establishment of religion, it differs from it only in degree; and is the first step in that direction. Id., Par. 9. Today as in his time 'the same authority which can force a citizen to contribute three pence only * * * for the support of any one [religious] establishment, may force him' to pay more; or 'to conform to any other establishment in all cases whatsoever.' And now, as then, 'either * * * we must say, that the will of the Legislature is the only measure of their authority; and that in the plentitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred.' *Remonstrance*, Par. 15.

"The realm of religious training and belief remains, as the Amendment made it, the kingdom of the individual man and his God. It should be kept inviolately private, not 'entangled * * * in precedents' or confounded with what legislatures legitimately may take over into the public domain."—Rutledge, J., Everson v. Board of Education, 330 U.S. 1, 57–58, 67 S.Ct. 504, 532.

Our constitutional policy "does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private. It cannot be made a public one by legislative act. This was the very heart of Madison's *Remonstrance*, as it is of the Amendment it-

self."—Rutledge, J., Everson v. Board of Education, supra, 52, 67 S.Ct., 529.

"The reasons underlying the Amendment's policy have not vanished with time or diminished in force. Now as when it was adopted the price of religious freedom is double. It is that the church and religion shall live both within and upon that freedom. There cannot be freedom of religion, safeguarded by the state, and intervention by the church or its agencies in the state's domain or dependency on its largesse. Madison's *Remonstrance,* Par. 6, 8. The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state. For when it comes to rest upon that secular foundation it vanishes with the resting. Id., Par. 7, 8. Public money devoted to payment of religious costs, educational or other, brings the quest for more. It brings too the struggle of sect against sect for the larger share or for any. Here one by numbers alone will benefit most, there another. That is precisely the history of societies which have had an established religion and dissident groups. Id., Par. 8, 11. It is the very thing Jefferson and Madison experienced and sought to guard against, whether in its blunt or in its more screened forms. Ibid. The end of such strife cannot be other than to destroy the cherished liberty. The dominating group will achieve the dominant benefit; or all will embroil the state in their dissensions. Id., Par. 11."—Rutledge, J., Everson v. Board of Education, supra, 53–54, 67 S.Ct. 529.

In a single paragraph the Court in *Everson* expressed the general principles evolved in the history of the religion clauses of the First Amendment. On these principles the justices were unanimous. The principles about public money spent for religious causes, and the principles about the use of public institutions to promote religious ideas, expressed in the *Everson* paragraph are decisive of the case at bar.

No elaboration of the point is necessary. The Court speaking through Justice Black, said, supra, 15–16, 67 S.Ct. 511:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' "

About public money spent for religious causes, the Court said, *inter alia*: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."

About the use of public institutions to promote religious ideas, the Court said, *inter alia*: "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion."

Justice Black, in the majority opinion in *Everson* stated the general proposition that the Establishment Clause commands neutrality. He says the amendment "requires the state to be a neutral in its relations with groups of religious

believers and non-believers; * * *. State power is no more to be used so as to handicap religions, than it is to favor them." 330 U.S. 1, 18, 67 S.Ct. 504, 513.

The neutrality doctrine has persisted. Justice Clark writing for the majority in School District v. Schempp and Murray v. Curlett, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) referred to a "wholesome neutrality", at page 222, 83 S.Ct. at page 1571. He also says: " * * * the Establishment Clause has been directly considered by this Court eight times in the past score of years and, with only one Justice dissenting on the point, it has consistently held that the clause withdrew all legislative power respecting religious belief or the expression thereof. The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

Significantly, here again, the Court's statement of the Establishment Clause test is broad and uncompromising.

From *Everson* (1947) to the present the justices have formulated the Establishment Clause in absolute terms.

Justice Black in *Everson* had said: "The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach", supra, 330 U.S. 18, 67 S.Ct. 513.

Justice Frankfurter endorsed strict disestablishment stating that "separation means separation, not something less. Jefferson's metaphor in describing the relation between church and State speaks of a 'wall of separation,' not of a fine line easily overstepped." McCollum v. Board of Education, 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring).

Justice Goldberg, in School District v. Schempp, 374 U.S. 203, at p. 305, 83 S.Ct. 1560, at p. 1615, states the hope that may be realized from neutrality: "The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end.

"The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief."

Justice Jackson, in *Everson*: "This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity. It was intended not only to keep the states' hands out of religion, but to keep religion's hands off the state, and above all, to keep bitter religious controversy out of public life by denying to every denomination any advantage from getting control of public policy or the public purse."

To paraphrase James Madison and Justice Rutledge, the case at bar "is not just a little case about bus fares", nor just a little case about a "three pence" exacted from the taxpayers for religion.

This case is about that "act of the whole American people", which Thomas Jefferson "contemplated with sovereign reverence", "building a wall of separation between church and state."

This case is about James Madison's question: "Who does not see that * * * the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?"

This case is about the purpose of the "religion clauses" of the First Amendment—"to promote and to assure the

fullet possible scope of religious liberty and tolerance for all."

This case is about the purpose of the establishment and freedom of religion clauses, "not only to keep the states' hands out of religion, but to keep religion's hands off the state, and above all, to keep bitter religious controversy out of public life by denying to every denomination any advantage from getting control of public policy or the public purse."

This case is about the command of the First Amendment as construed by the Supreme Court, that "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."

This case is about the commands of the First Amendment, as construed by the Supreme Court, that "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance."

██ The defenses of abstention and lack of standing are without merit. Nothing in the abstention doctrine requires this court to abstain from deciding the Utah constitutional questions. The state provision is virtually identical to the Federal:

"Decision here does not require the federal court to determine or shape state policy governing administrative agencies. It entails no interference with such agencies or with state courts. No litigation is pending in the state courts in which the questions presented here could be decided. We are pointed to no public policy or interest which would be served by withholding from petitioners the benefit of the jurisdiction which Congress has created with the purpose that it should be availed of and exercised subject only to such limitations as traditionally justify courts in declining to exercise the jurisdiction which they possess." Meredith et al. v. City of Winter Haven, 320 U.S. 228 at 237, 64 S.Ct. 7 at 12, 88 L.Ed. 9 (1943).

"It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Monroe v. Pape, 365 U.S. 167 at 183, 81 S.Ct. 473 at 482, 5 L.Ed.2d 492 (1961).

██ The defense of lack of standing likewise is without merit: Standing may be predicated upon non-economic as well as economic interests, Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184, and paramount among such non-economic interests conferring standing is a spiritual stake in Establishment Clause and Free Exercise Clause values. Id. at 154, 90 S.Ct. 827. See also, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 947 (1968); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965); Office of Communication of United Church of Christ v. FCC, 123 U.S.App. D.C. 328, 359 F.2d 994 (1968). For purposes of standing under the Establishment Clause, plaintiffs need not show that their religious freedom has been infringed. School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Thus, it is enough to show infringement of a personal stake in Establishment Clause values if plaintiffs claim, as these plaintiffs do, devotion of public land in which they have a beneficial interest to an establishment of religion. Allen v. Hickel, 138 U.S.App.D.C. 31, 424 F.2d 944, 947 (1970).

In 1963 the Supreme Court said in School District v. Schempp: "As we have indicated, the Establishment Clause has been directly considered by this Court eight times in the past score of years [since *Everson*] and, with only one Justice dissenting on the point, it has consistently held that the [Establishment] clause withdrew all legislative power respecting religious belief or the expression thereof.

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." (Citations omitted.)

What are the purpose and the primary effect of the Ten Commandments Monument?

The purpose *and* the primary effect of the action of the Boards of Commissioners is the advancement of religion. The purposes of the Eagles must be deemed to have been adopted by the Commissioners when they authorized the erection of this stone. We are entitled to assume the Commissioners could and did read the message on the stone, as well as the Eagles' statement of purposes, in evidence, and that they knew and understood what they were doing.

The message on the stone is clearly religious in character. This is demonstrated in the earlier part of this opinion, where the inscriptions are described.

The testimony of Father Wesley Frensdorff, a priest of the Episcopal Church and Dean of St. Mark's Cathedral, in Salt Lake City at the time of the trial, who had accepted the position of Episcopal Bishop of Nevada, was particularly impressive: "Q: I was asking if you have an opinion, Father Frensdorff, on whether the primary effect of this monument would be religious. "A: Cer-

tainly it would be for me. I believe it would be for the majority of people thought of in a religious context, and I certainly believe that I would find it very difficult to understand the Ten Commandments in any other than a religious context, just the very basis of it, not only its origin, but I don't think you can take part of the Commandments and consider them separately, because they are all one piece, because the Judaic Christian tradition understands a relationship with God and with neighbors, one another as one whole, and the two cannot really be separated."

The religious message is the basic feature in the educational aims of the Eagles and the Commissioners in placing this monument.

The Court is convinced that this stone represents a conspicuous and substantial effort to impress the teaching of the inscription upon the minds of those who are constrained to visit the courthouse.

■ The Commissioners have given affirmative and direct aid to this teaching in the form of a financial grant. It involves direct assistance for the erection and maintenance of a monument on taxpayers' property which teaches religious theory. The religious benefits derived from this use of public money greatly outweigh any secular purposes which such aid might provide. Such assistance would seem clearly to fall within the proscription of the First Amendment's establishment clause. See Everson v. Board of Education, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511 (1947) where it was said: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid * * * one religion over another * * *. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."

The City and County Commission may not aid "one religion over another". In addition to being a violation of the Establishment Clause of the First Amendment and of the Liberty Clause of the Fourteenth Amendment, this is a violation of the Equal Protection Clause of the Fourteenth, being an invidious discrimination and unconstitutional. If all such religions, lodges or institutions are allowed to plant tombstone-like slabs on the courthouse grounds, the lawns will resemble a disorderly and unsightly cemetery. The Commissioners may be in the unenviable position of being obliged to face up to this dilemma.

Our research has revealed only a single case ruling directly upon the question whether a *permanent* religious monument could be erected and maintained upon public land. There the Oregon Supreme Court ruled, as this Court rules, that such a practice violates the Establishment Clause. Lowe v. City of Eugene, 254 Or. 518, 451 P.2d 117, 459 P.2d 222, 463 P.2d 360 (1969), app. dismd. sub nom. Eugene Sand & Gravel, Inc. v. Lowe, et al., 397 U.S. 591, 90 S.Ct. 1366, 25 L.Ed.2d 597 (1970), cert. den. 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654 (1970), reh. den. 398 U.S. 944, 90 S.Ct. 1838, 26 L.Ed.2d 283 (1970).

## APPENDIX.

### MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS

To the Honorable the General Assembly of

The Commonwealth of Virginia.
A Memorial and Remonstrance.

We, the subscribers, citizens of the said Commonwealth, having taken into serious consideration, a Bill printed by order of the last Session of General Assembly, entitled "A Bill establishing a provision for Teachers of the Christian Religion," and conceiving that the same, if finally armed with the sanctions of a law, will be a dangerous abuse of power, are bound as faithful members of a free State, to remonstrate against it, and to declare the reasons by which we are determined. We remonstrate against the said Bill,

1. Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence." [1] The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable; because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men: It is unalienable also; because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true, that the majority may trespass on the rights of the minority.

1. Decl. Rights, Art. 16. [Note in the original.]

2. Because if religion be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. Their jurisdiction is both derivative and limited: it is limited with regard to the coordinate departments, more necessarily it is limited with regard to the constituents. The preservation of a free government requires not merely, that the metes and bounds which separate each department of power may be invariably maintained; but more especially, that neither of them be suffered to overleap the great Barrier which defends the rights of the people. The Rulers who are guilty of such an encroachment, exceed the commission from which they derive their authority, and are Tyrants. The People who submit to it are governed by laws made neither by themselves, nor by an authority derived from them, and are slaves.

3. Because, it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of [the] noblest characteristics of the late Revolution. The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much, soon to forget it. Who does not see that the same authority which can establish Christianity in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

4. Because, the bill violates that equality which ought to be the basis of every law, and which is more indispensible, in proportion as the validity or expediency of any law is more liable to be impeached. If "all men are by nature equally free and independent," [2] all men are to be considered as entering into Society on equal conditions; as relinquishing no more, and therefore retaining no less, one than another, of their natural rights. Above all are they to be considered as retaining an *"equal* title to the free exercise of religion, according to the dictates of conscience." [3] Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to men, must an account of it be rendered. As the Bill violates equality by subjecting some to peculiar burdens; so it violates the same principle, by granting to others peculiar exemptions. Are the Quakers and Menonists the only sects who think a compulsive support of their religions unnecessary and unwarrantable? Can their piety alone be intrusted with the care of public worship? Ought their Religions to be endowed above all others, with extraordinary privileges, by which proselytes may be enticed from all others? We think too favorably of the justice and good sense of these denominations, to believe that they either covet preeminencies over their fellow citizens, or that they will be seduced by them, from the common opposition to the measure.

5. Because the bill implies either that the Civil Magistrate is a competent Judge of Religious truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: The second an unhallowed perversion of the means of salvation.

2. Decl. Rights, Art. 1. [Note in the original.]

3. Art. 16. [Note in the original.]

6. Because the establishment proposed by the Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself; for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them; and not only during the period of miraculous aid, but long after it had been left to its own evidence, and the ordinary care of Providence: Nay, it is a contradiction in terms; for a Religion not invented by human policy, must have preexisted and been supported, before it was established by human policy. It is moreover to weaken in those who profess this Religion a pious confidence in its innate excellence, and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits.

7. Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries, has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy; ignorance and servility in the laity; in both, superstition, bigotry and persecution. Enquire of the Teachers of Christianity for the ages in which it appeared in its greatest lustre; those of every sect, point to the ages prior to its incorporation with Civil policy. Propose a restoration of this primitive state in which its Teachers depended on the voluntary rewards of their flocks; many of them predict its downfall. On which side ought their testimony to have greatest weight, when for or when against their interest?

8. Because the establishment in question is not necessary for the support of Civil Government. If it be urged as necessary for the support of Civil Government only as it is a means of supporting Religion, and it be not necessary for the latter purpose, it cannot be necessary for the former. If Religion be not within [the] cognizance of Civil Government, how can its legal establishment be said to be necessary to civil Government? What influence in fact have ecclesiastical establishments had on Civil Society? In some instances they have been seen to erect a spiritual tyranny on the ruins of Civil authority; in many instances they have been seen upholding the thrones of political tyranny; in no instance have they been seen the guardians of the liberties of the people. Rulers who wished to subvert the public liberty, may have found an established clergy convenient auxiliaries. A just government, instituted to secure & perpetuate it, needs them not. Such a government will be best supported by protecting every citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another.

9. Because the proposed establishment is a departure from that generous policy, which, offering an asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country, and an accession to the number of its citizens. What a melancholy mark is the Bill of sudden degeneracy? Instead of holding forth an asylum to the persecuted, it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance. The magnanimous sufferer under this cruel scourge in foreign Regions, must view the Bill as a Beacon on our Coast, warning him to seek some other haven, where liberty and philanthrophy in their due extent may offer a more certain repose from his troubles.

10. Because, it will have a like tendency to banish our Citizens. The allure-

ments presented by other situations are every day thinning their number. To superadd a fresh motive to emigration, by revoking the liberty which they now enjoy, would be the same species of folly which has dishonoured and depopulated flourishing kingdoms.

11. Because, it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm to extinguish Religious discord, by proscribing all difference in Religious opinions. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. The American Theatre has exhibited proofs, that equal and compleat liberty, if it does not wholly eradicate it, sufficiently destroys its malignant influence on the health and prosperity of the State. If with the salutary effects of this system under our own eyes, we begin to contract the bonds of Religious freedom, we know no name that will too severely reproach our folly. At least let warning be taken at the first fruits of the threatened innovation. The very appearance of the Bill has transformed that "Christian forbearance,[4] love and charity," which of late mutually prevailed, into animosities and jealousies, which may not soon be appeased. What mischiefs may not be dreaded should this enemy to the public quiet be armed with the force of a law?

12. Because, the policy of the bill is adverse to the diffusion of the light of Christianity. The first wish of those who enjoy this precious gift, ought to be that it may be imparted to the whole race of mankind. Compare the number of those who have as yet received it with the number still remaining under the dominion of false Religions; and how small is the former! Does the policy of the Bill tend to lessen the disproportion? No; it at once discourages those who are strangers to the light of [revelation] from coming into the Region of it; and countenances, by example the nations who continue in darkness, in shutting out those who might convey it to them. Instead of levelling as far as possible, every obstacle to the victorious progress of truth, the Bill with an ignoble and unchristian timidity would circumscribe it, with a wall of defence, against the encroachments of error.

13. Because attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society. If it be difficult to execute any law which is not generally deemed necessary or salutary, what must be the case where it is deemed invalid and dangerous? and what may be the effect of so striking an example of impotency in the Government, on its general authority.

14. Because a measure of such singular magnitude and delicacy ought not to be imposed, without the clearest evidence that it is called for by a majority of citizens: and no satisfactory method is yet proposed by which the voice of the majority in this case may be determined, or its influence secured. "The people of the respective counties are indeed requested to signify their opinion respecting the adoption of the Bill to the next Session of Assembly." But the representation must be made equal, before the voice either of the Representatives or of the Counties, will be that of the people. Our hope is that neither of the former will, after due consideration, espouse the dangerous principle of the Bill. Should the event disappoint us, it will still leave us in full confidence, that a fair appeal to the latter will reverse the sentence against our liberties.

15. Because, finally, "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience" is held by the same tenure with all our other rights. If we recur to its origin, it is equally the gift of na-

4. Art. 16. [Note in the original.]

ture; if we weigh its importance, it cannot be less dear to us; if we consult the Declaration of those rights which pertain to the good people of Virginia, as the "basis and foundation of Government," [5] it is enumerated with equal solemnity, or rather studied emphasis. Either then, we must say, that the will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: Either we must say, that they may controul the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary Powers of the State; nay that they may despoil us of our very right of suffrage, and erect themselves into an independent and hereditary assembly: or we must say, that they have no authority to enact into law the Bill under consideration. We the subscribers say, that the General Assembly of this Commonwealth have no such authority: And that no effort may be omitted on our part against so dangerous an usurpation, we oppose to it, this remonstrance; earnestly praying, as we are in duty bound, that the Supreme Lawgiver of the Universe, by illuminating those to whom it is addressed, may on the one hand, turn their councils from every act which would affront his holy prerogative, or violate the trust committed to them: and on the other, guide them into every measure which may be worthy of his [blessing, may re]dound to their own praise, and may establish more firmly the liberties, the prosperity, and the Happiness of the Commonwealth.

II   Madison, 183–191.

SUPPLEMENTAL APPENDIX.

A BILL ESTABLISHING A PROVISION FOR TEACHERS OF THE CHRISTIAN RELIGION.

Whereas the general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve the peace of society; which cannot be effected without a competent provision for learned teachers, who may be thereby enabled to devote their time and attention to the duty of instructing such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge; and it is judged that such provision may be made by the Legislature, without counteracting the liberal principle heretofore adopted and intended to be preserved by abolishing all distinctions of pre-eminence amongst the different societies or communities of Christians;

*Be it therefore enacted by the General Assembly,* That for the support of Christian teachers,      per centum on the amount, or    in the pound on the sum payable for tax on the property within this Commonwealth, is hereby assessed, and shall be paid by every person chargeable with the said tax at the time the same shall become due; and the Sheriffs of the several Counties shall have power to levy and collect the same in the same manner and under the like restrictions and limitations, as are or may be prescribed by the laws for raising the Revenues of this State.

*And be it enacted,* That for every sum so paid, the Sheriff or Collector shall give a receipt, expressing therein to what society of Christians the person from whom he may receive the same shall direct the money to be paid, keeping a distinct account thereof in his books. The Sheriff of every County, shall, on or before the      day of      in every year, return to the Court, upon oath, two alphabetical lists of the payments to him made, distinguishing in columns opposite to the names of the persons who shall have paid the same, the society to which the money so paid was by them appropriated; and one column for the names where no appropriation shall be made. One of which lists, after being recorded in a book to be kept

5.  Decl. Rights-title.  [Note in the original.]

for that purpose, shall be filed by the Clerk in his office; the other shall by the Sheriff be fixed up in the Courthouse, there to remain for the inspection of all concerned. And the Sheriff, after deducting five per centum for the collection, shall forthwith pay to such person or persons as shall be appointed to receive the same by the Vestry, Elders, or Directors, however denominated of each such society, the sum so stated to be due to that society; or in default thereof, upon the motion of such person or persons to the next or any succeeding Court, execution shall be awarded for the same against the Sheriff and his security, his and their executors or administrators; provided that ten days previous notice be given of such motion. And upon every such execution, the Officer serving the same shall proceed to immediate sale of the estate taken, and shall not accept of security for payment at the end of three months, nor to have the goods forthcoming at the day of sale; for his better direction wherein, the Clerk shall endorse upon every such execution that no security of any kind shall be taken.

*And be it further enacted,* That the money to be raised by virtue of this Act, shall be by the Vestries, Elders, or Directors of each religious society, appropriated to a provision for a Minister or Teacher of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever; except in the denominations of Quakers and Menonists, who may receive what is collected from their members, and place it in their general fund, to be disposed of in a manner which they shall think best calculated to promote their particular mode of worship.

*And be it enacted,* That all sums which at the time of payment to the Sheriff or Collector may not be appropriated by

the person paying the same, shall be accounted for with the Court in manner as by this Act is directed; and after deducting for his collection, the Sheriff shall pay the amount thereof (upon account certified by the Court to the Auditors of Public Accounts, and by them to the Treasurer) into the public Treasury, to be disposed of under the direction of the General Assembly, for the encouragement of seminaries of learning within the Counties whence such sums shall arise, and to no other use or purpose whatsoever.

THIS Act shall commence, and be in force, from and after the      day of     in the year

*A Copy from the Engrossed Bill.*
John Beckley, C. H. D.

*Washington Mss. (Papers of George Washington, Vol. 231); Library of Congress.*[*]

---

[*] This copy of the Assessment Bill is from one of the handbills which on December 24, 1784, when the third reading of the bill was postponed, were ordered distributed to the Virginia counties by the House of Delegates. See Journal of the Virginia House of Delegates, December 24, 1784; Eckenrode, 102–103. The bill is therefore in its final form, for it never again reached the floor of the House. Eckenrode, 113.