Alma F. ANDERSON et al., Plaintiffs-Appellees,

v.

SALT LAKE CITY CORPORATION and Salt Lake County, Defendants-Appellants.

Nos. 72–1286, 72–1287.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 18, 1972.

Decided March 16, 1973.

**30**

Ray L. Montgomery, Asst. Salt Lake City Atty., and Merrill K. Davis, Deputy, Salt Lake County Atty. (Jack L. Crellin, Salt Lake City Atty., and Carl J. Nemelka, Salt Lake County Atty., with them on the briefs), for defendants-appellants.

Bryce E. Roe, Salt Lake City, Utah (William G. Fowler, Salt Lake City, Utah, with him on the brief), for plaintiffs-appellees.

Before MURRAH, SETH and DOYLE, Circuit Judges.

MURRAH, Circuit Judge.

The Boards of Commissioners of Salt Lake City and Salt Lake County informally permitted the Fraternal Order of Eagles to erect on city-county courthouse grounds a permanent 3 x 5-foot granite monolith inscribed with a version of the Ten Commandments and certain other symbols representing the All Seeing Eye of God, the Star of David, the Order of Eagles, letters of the Hebraic alphabet, and Christ or peace. After erection of the monolith in a prominent place near the courthouse entrance, the Commissioners of the City formally authorized the installation and maintenance of lighting equipment to illuminate and enhance the display, at City and County expense. Similar monoliths have been erected in public places across the United States and Canada—nine of them in Utah—as part of the Eagles' established and continuing "youth guidance program," and ". . . to inspire all who pause to view them, with a renewed respect for the law of God, which is our greatest strength against the forces that threaten our way of life."

The plaintiffs, all residents and taxpayers of Salt Lake County, brought this suit seeking removal of the monolith and an injunction prohibiting the City and County from permitting erection or maintenance of any similar monument on public land, alleging that the presence of the monolith is a violation of the Establishment Clause of the First Amendment, United States Constitution, and Article 1, Section 4, of the Utah Constitution.

Upon trial, the court, 348 F.Supp. 1170, held that the message conveyed by the monolith was "clearly religious in character;" that by their actions the Boards of Commissioners must be deemed to have adopted the program of the Order of Eagles, with the purpose and primary effect of advancing the cause of religion and certain religious concepts, thus inhibiting the ideas of persons with alternative beliefs, con-

trary to the prohibitions of the Establishment and Free Exercise Clauses of the First Amendment. Judgment was entered for the plaintiffs. We cannot agree, and, therefore, reverse the judgment.

■ The City and County challenge the standing of the plaintiffs to bring this suit, alleging lack of a proper nexus between plaintiffs' status and the alleged constitutional infringement, and failure to show any direct injury. But we think the requisite standing is clearly conferred by non-economic religious values when the plaintiffs assert a litigable interest under the Establishment and Free Exercise Clauses of the Federal Constitution. *E. g.,* Allen v. Hickel, 138 U.S.App.D.C. 31, 424 F.2d 944, 946 (1970), citing Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 616 (2d Cir. 1965). We think the plaintiffs have standing based on their beliefs about religion to question whether those beliefs have been infringed upon by an alleged use of public property for religious purposes.

■ We do not understand either the City or County to contend that the erection and maintenance of the monolith was not done under color of state law, in the constitutional sense in which the question is presented here for decision. *Cf.* Lowe v. City of Eugene, 254 Or. 518, 463 P.2d 360 (1969), cert. denied, Eugene Sand & Gravel v. Lowe, 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654 (1970); Allen v. Hickel, *supra,* 424 F.2d

at 947; and Everson v. Board of Education, 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The City and County do invoke the abstention doctrine, contending that the federal court should have stayed its hand while the matter in issue is litigated in the state courts under the similar clauses of the state and federal constitutions. But this is not a case or circumstance calling for abstention of the exercise of federal jurisdiction. The right asserted here is a basic First Amendment right, of which the federal court has jurisdiction, and, although a like provision of the state constitution is involved, proper resolution of the federal right is not conditioned upon resolution of any state question, law, or constitution. *See, e. g.,* Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971); Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), quoting Stapleton v. Mitchell, 60 F.Supp. 51, 55 (D.C.Kan.1945); and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ This brings us to the point of applying the Establishment Clause to the facts in this case. Surely nothing we can say at this time or place concerning the scope and effect of the Establishment Clause can serve to add to what has already been so prolifically said elsewhere. From Everson v. Board of Education, *supra,* to Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court has treated the Establishment and Free Exercise Clauses under various factual situations with perplexing diversity of views.[1] But throughout all these schol-

---

1. For example: In Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L. Ed. 711 (1947), Jackson and Rutledge, JJ., filed separate dissenting opinions; in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), Black, Frankfurter and Jackson, JJ., each filed a separate dissenting opinion; in McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), Harlan, J., joined Frankfurter, J., in an 83-page dissenting opinion with two appendices; in Abington School Dist. v. Schemp, 374 U.S. 203,

83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), Douglas, Brennan and Goldberg, JJ., each concurred separately, while Stewart, J., dissented; in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), Brennan, J., concurred specially, Harlan, J., wrote a separate opinion, and Douglas, J., dissented; and, in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1971), Black, J., joined Douglas, J., in a special concurrence, while Brennan and White, JJ., wrote separate opinions.

arly and authoritative writings runs a strain of consistency—one clear and distinct tenet of which we can be sure—the Constitution mandates complete government neutrality in religious matters. *See, e. g.,* Everson v. Board of Education, *supra;* and Abington School Dist. v. Schemp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

The government may not "... pass laws which aid one religion, aid all religions, or prefer one religion over another ...." Everson v. Board of Education, *supra,* 330 U.S. at 15, 67 S.Ct. at 511. Nor can one cent of taxpayers' money be devoted to religious purposes. *E. g.,* Douglas, J., concurrence, Lemon v. Kurtzman, *supra,* 403 U.S. at 640, 91 S.Ct. 2105, and Everson v. Board of Education, *supra,* 330 U.S. at 16, 67 S.Ct. 504.

In Lemon v. Kurtzman, *supra,* Chief Justice Burger reviewed and summarized the case history of the Establishment Clause. Said he, "[o]ur prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. ... Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." 403 U.S., at 614, 91 S.Ct., at 2112. Writing in the same case, Mr. Justice Brennan delineated pertinent standards in these words, "[w]hat the framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice." 403 U.S., at 643, 91 S.Ct., at 2126, quoting Abington School Dist. v. Schemp, *supra,* 374 U.S. at 294–295, 83 S.Ct. 1560

(concurring opinion), and Walz v. Tax Commission, 397 U.S. 664, 680–681, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (concurring opinion). From all that has been said, "[t]he test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." *E. g.,* Abington School Dist. v. Schemp, *supra,* 374 U.S. at 222, 83 S.Ct. at 1571.

In applying this test, we must strike a balance between that which is primarily religious and that which is primarily secular, albeit embodying some religious impact. A tempered approach obviates the absurdity of striking down insubstantial and widely accepted references to the diety in circumstances such as courtroom ceremony, oaths of public office, and on national currency and coin. *E. g.,* Allen v. Hickel, *supra,* 424 F.2d at 949. Overzealous rigidity may diminish or ultimately destroy the bulwark we have erected against governmental interference in matters of religion. Walz v. Tax Commission, *supra* 397 U.S. at 669, 90 S.Ct. 1409. We know that "[t]he Government may depict objects with a spiritual content, but it may not promote or give its stamp of approval to such spiritual content." Allen v. Hickel, *supra* 424 F.2d at 948.

The decisions involving factual relationships more closely bearing upon our own case suffer from a lack of unanimity of reasoning and results. A brief reference to those cases serves to bring our case into constitutional focus. A string of lights in the form of a Latin Cross on the side of a courthouse was not a violation of the Establishment Clause because its primary purpose was found to be seasonal decoration of the downtown area for the benefit of business. *See.* Paul v. Dade County, 202 So. 2d 833 (Fla.App.1967), cert. denied, 207 So.2d 690 (Fla.1967), cert. denied, 390 U.S. 1041, 88 S.Ct. 1636, 20 L.Ed.2d 304 (1968). In Allen v. Hickel, *supra,* the plaintiffs objected to the annual erection

of a creche on federal land, as part of a continuing seasonal pageant initiated in 1954. The trial court granted defendants' motion for summary judgment on grounds that the creche was only one of a group of symbols intended to represent the way Americans celebrate a particular holiday season. The Court of Appeals reasoned that the absence of evidence precluded determination of the "purpose and primary effect" of the creche, and accordingly remanded the case. Plaques were subsequently installed at the display explaining the secular purpose and history of the pageant. On remand the trial court recognized the religious significance of a nativity scene, but, in view of the additional secular significance of the creche in the over-all circumstances of the pageant, held that the religious effect was not substantial, hence the creche was not proscribed. See Allen v. Morton, 333 F. Supp. 1088 (D.C.D.C.1971).

In another case involving issues similar to those we face here, Lowe v. City of Eugene, *supra*, the city issued permits for erection of a permanent cross in a municipal park. Despite contentions by the city that the cross was to be a war memorial and an attraction for local business, and that the erection did not involve public expense, the court ordered removal of the monument on grounds that the cross represented preferential treatment of particular religious ideas by the municipality. In another case, an Oklahoma City resident and taxpayer brought a suit seeking an injunction to prevent the city or its officials from maintaining a 50-foot-high Latin Cross at the municipal fairgrounds. The Supreme Court of Oklahoma, affirming unanimously the sustaining of defendant's general demurrer on grounds that the cross was displayed in a "secular environment" and displayed sectarian ideas only in a "most evanescent" manner, emphasized that the action was brought only under the Oklahoma Constitution, and did not involve a question of federal relief. Meyer v. Oklahoma City, 496 P.2d 789 (Okl.1972), cert. denied, 409 U.S. 980, 93 S.Ct. 314, 34 L. Ed.2d 244.

It is against this background that we determine the "purpose and primary effect" of the subject monolith. The exact origin of the Ten Commandments is uncertain,[2] but testimony in the record aids the supposition that a large portion of our population believes they are Bible based. Even so, an ecclesiastical background does not necessarily mean that the Decalogue is primarily religious in character—it also has substantial secular attributes. Indeed, one of the plaintiffs in our case, a lawyer, admitted while testifying that, ". . . the Ten Commandments is an affirmation of at least a precedent legal code."

Although one of the declared purposes of the monolith was to inspire respect for the law of God, yet at the same time secular purposes were also emphasized. It is noteworthy that the Order of the Eagles is not a religious organization—it is a fraternal order which advocates ecclesiastical law as the temporal foundation on which all law is based, but this creed does not include any element of coercion concerning these beliefs, unless one considers it coercive to look upon the Ten Commandments. (Although they are in plain view, no one is required to read or recite them. Cf., e. g., Cohen v. State of California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).)

So the Decalogue is at once religious and secular, as, indeed, one would expect, considering the role of religion in our traditions. After all, "[w]e are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). "It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of

---

2. See, e. g., J. Stamm and M. Andrew, The Ten Commanments in Recent Research 22–28, et seq. (2d ed. 1962).

**34**

Madison, are 'earnestly praying, as . . . in duty bound, that the Supreme Lawgiver of the Universe . . . guide them into every measure which may be worthy of his [blessing . . . .].'" Abington School Dist. v. Schemp, *supra*, 374 U.S. at 213, 83 S. Ct. at 1566, quoting Memorial and Remonstrance Against Religious Assessments, as cited in Everson v. Board of Education, *supra*, 330 U.S. at 71–72, 67 S.Ct. 504 (appendix to dissenting opinion). "The history of man is inseparable from the history of religion." *See* Engel v. Vitale, 370 U.S. 421, 434, 82 S. Ct. 1261, 1268, 8 L.Ed.2d 601 (1962).

█ It does not seem reasonable to require removal of a passive monument, involving no compulsion, because its accepted precepts, as a foundation for law, reflect the religious nature of an ancient era. *See, e. g.*, Griswold, Absolute is in the Dark—A Discussion of the Approach of the Supreme Court to Constitutional Questions, 8 Utah Law Rev. 167, 173–176 (1963). The wholesome neutrality guaranteed by the Establishment and Free Exercise Clauses does not dictate obliteration of all our religious traditions. *See, e. g.*, Griswold, *supra*. Although an accompanying plaque explaining the secular significance of the Ten Commandments would be appropriate in a constitutional sense, we cannot say that the monument, as it stands, is more than a depiction of a historically important monument with both secular and sectarian effects.

█ No one can be the judge of his own objectivity. It may well be that in this blurred, indistinct area of our national life and environment, opinions about the purpose and effect of the monolith are influenced by orthodox or unorthodox propensities. But be that as it may, we are brought to the conclusion that the monolith is primarily secular, and not religious in character; that neither its purpose or effect tends to establish religious belief.

The judgment of the District Court is, accordingly, reversed.