**CITIZENS CONCERNED FOR SEPARATION OF CHURCH AND STATE, Plaintiff,**

v.

**The CITY AND COUNTY OF DENVER, Defendant.**

Civ. A. No. 79–M–1605.

United States District Court, D. Colorado.

Dec. 17, 1979.

Jonathon B. Chase, University of Colorado, School of Law, Boulder, Colo., for plaintiff.

Daniel H. Israel, Boulder, Colo., for American Civil Liberties Union Foundation of Colorado.

Stanley M. Sharoff, Stanley Erickson, Jr., Asst. City Attys., City and County of Denver, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is a civil action by an unincorporated association of residents and taxpayers of the City and County of Denver, Colorado, appearing through the American Civil Liberties Union, seeking to enjoin the use of a Nativity Scene as a part of a Christmas lighting display erected and maintained as a governmental activity of the City and County of Denver on the public property of the building which is the central headquarters of that government. The claim is under 42 U.S.C. § 1983 and jurisdiction is found in 28 U.S.C. § 1343(3). At the hearing held on the plaintiff's motion for a preliminary injunction, the parties stipulated to a consolidation with the trial on the merits, as authorized in Rule 65(a)(2) of the Federal Rules of Civil Procedure. Accordingly, all of the evidence has been taken, the arguments have been heard, and the case is ready for final disposition.

For many years, Denver has had a lighting display at the City and County Building in downtown Denver during the annual Christmas holiday season. Normally, the lights have been turned off after New Year's Day and then turned on again in mid-January for the ten days of the National Western Stock Show.

Wilbur Latham has been working on such displays for the past forty years as a part of his regular employment with the City's Parks and Recreation Department. Mr. Latham has been the person responsible for planning and construction of such displays since 1956. Each year he has sought to arrange the lighting and physical objects used in differing configurations, recognizing that large numbers of people photograph the display each year and seek a variety of scenes.

Mr. Latham testified that there has always been a creche in the display. Since 1962, that scene has consisted of life-size figurines of Mary, Joseph, the infant Jesus, shepherds, wise men, and domesticated animals. The figurines of Mary and Joseph are posed in a devotional attitude and they are within a barnlike structure with the baby in a manger. The scene is, therefore, a depiction of the birth of Christ as described in the writings of St. Matthew, St. John, and St. Luke.

The figurines used in the Nativity Scene were purchased by Denver with public funds in 1962. The annual display also includes comparably made figurines of Santa Claus, his sleigh and reindeer, and an elves' toy shop. These too were purchased with public funds. From time to time there have been some replacements and repairs paid for by private donations.

The designed total effect of the display is to turn the entire front of the City and County Building into a spectacle of lights, and when viewed from a distance, the Nativity Scene is almost indiscernible. About ninety percent of the persons viewing this display do so from cars while driving by in front of the building. The Santa Claus and reindeer, the toy shop, and the creche are clearly distinguishable from that vantage point. Persons may also walk by the display; but the physical objects are fenced off for safety.

Before the display was erected in 1978, persons associated with the plaintiff's point of view requested the Mayor of Denver to exclude the Nativity Scene. There was a strong public reaction with letters and petitions urging a rejection of that request and an adherence to tradition. The common contention in those communications was that it would be wrong to "take Christ out of Christmas."

In November 1979, counsel for the plaintiff appeared before the Denver City Council and again urged exclusion of the Nativity Scene in the 1979 display. That appeal was based upon the same ground urged in this lawsuit and both the Mayor and City Council denied the request. The complaint in this case was then filed on November 28, 1979, and, again, the issue was the subject of many petitions and letters to the Mayor, overwhelmingly in support of his position. To these communications, the Mayor addressed the following standard response:

> Thank you for your letter concerning the Nativity Scene in front of the City and County Building. I appreciate your taking the time to advise me of your thoughts in this regard.
>
> Please be assured that I do plan to keep the Nativity Scene in our traditional Christmas display unless I am ordered by the Courts to take it down.

The Nativity Scene had not yet been erected when this case was filed. At the time of trial, the Nativity Scene, Santa Claus, the reindeer, and the toy shop, were all in place on the front steps of the City and County Building. All of the other elements have also been incorporated in the display and the lights are scheduled to be turned on for public viewing on the evening of Monday, December 17, 1979. A removal of the creche and a repositioning of the other objects on the front steps can be accomplished within one working day.

The plaintiff's contention is that the Nativity Scene is a religious symbol and that by including it in the Christmas display the City and County of Denver has violated the establishment clause of the First Amendment, which is incorporated in the Four-teenth Amendment to the United States Constitution. In considering that contention, this court is limited to the evidentiary record presented upon trial. Any personal beliefs or opinions must be excluded because they are as irrelevant as is the predominant public opinion. The unique role of our constitution is protection from all forms of tyranny, whether individual or collective.

The evidence presented at this trial is so overwhelmingly supportive of the plaintiffs' position, and the defendant's attempts to justify its politically popular stand on legal grounds have been so feeble, that there may be some question as to whether there is an actual legal controversy or an abdication of responsibility for decision making. It should be recognized that all who hold public office have an equal obligation to adhere to the United States Constitution. While the judicial branch has the undeniable duty to declare the invalidity of legislative and executive acts which violate the proscriptions of the organic law, the courts should not be used merely for the convenience of those who wish to avoid the unpleasant consequences of a required resistance to the majoritarian view on a clamorous issue.

The only witness called by the defendant is a professor of religious studies who has been ordained in the United Church of Christ and has served as a pastor. After being qualified as an authority on religious symbols, the defendant's witness opined that while there is no universally accepted definition, it is generally agreed that such a symbol, unlike signs, awakens a depth of response and "participates in that to which it points." He accepted the creche as a religious symbol, without question, but expressed the view that the depth of awakened response would vary among persons and according to the context in which it is displayed. Some would see it as a depiction of an historical event; some would see it as a depiction of a theological event; and the witness' personal opinion was that while he would object to the creche alone on the steps of City Hall, there was no religious

experience for him in the context of the Christmas lighting display. He agreed that it would not surprise him to learn that both Christians and non-Christians may see the creche as a religious symbol in the display; but, he expressed concern that to remove it for that reason may have some chilling effect.

The plaintiff also called theologians who testified as expert witnesses. Another professor of theology who teaches the philosophy of religion and who was also ordained in the United Church of Christ and has served as a minister in the Methodist and Congregational Churches testified that the Nativity Scene has been used as a teaching device for the indoctrination of illiterate persons since the Middle Ages. In his view, the contemporary role of the creche is to serve as a symbol, reminding the viewers of the incarnation of the deity, "a cosmic event of saving significance." Today, most Christians stress Jesus as the symbol of the redeeming power of God at work in the world and see the Nativity Scene as evoking strong feelings of joy and deep feelings of reverence in a way quite different from Santa Claus, Christmas lights, Christmas trees and other holiday ornamentation.

The witness further noted that there are many differences of opinion among scholars and theologians as to the date of the birth of Jesus Christ as an historical event. It is generally accepted that December 25 is not the anniversary of that birth. That date was established by Liberius, the Bishop of Rome, in the Fourth Century. It is also a time of significance in many other cultures and beliefs. The winter solstice has long been a season of celebration and pagan ritual.

The witness said that the blend of pagan and Christian aspects in the celebration of Christmas has been a matter as to which there have been significant separations of opinion among faiths and sects under the canopy of Christianity. The Pilgrims, devoutly religious, prohibited the celebration of Christmas by idleness and idolatry; the Quakers have not been comfortable with the use of symbols, and Jehovah's Witnesses consider Christmas displays to be pagan.

The expert acknowledged that Christ is an important historical figure in Western culture but differs from such other historical persons as Abraham Lincoln, Christopher Columbus and Karl Marx in that Jesus is the central figure in Christianity. The witness expressed personal opposition to inclusion of the creche in the Denver Christmas display because he thinks it confuses the nature of the Christmas celebration and because he is aware of the sensitivity of others, recognizing that there is a history of oppression affiliated with the establishment of any state religion. He expressed personal concern that such a use of a religious symbol may intensify divisiveness in the community.

The validity of that concern about divisive effects was demonstrated by the testimony of other witnesses called by the plaintiff. A lawyer who was raised in a Jewish family testified that she felt surprise and anger in viewing the 1978 display because the Nativity Scene represented a religious, mystical symbolism which has never been accepted in the Jewish religion and to her it was a painful reminder of the history of oppression of Jews. Her expressed concern was with the obvious connection between that symbolism and the city government. She had no such feelings with respect to religious art in a city-owned museum.

A member of the American Atheists Society testified that he felt fear when he saw the creche in the display with what he perceived to be an obvious religious intent, recognizing that the majority religion in the United States is Christian, which he defined to be any faith which has the incarnation of God as a central tenet. To that witness, the impression was that the city endorses such faith contrary to his view that the Constitution protects him from an imposed religion. The atheist witness is married to a Roman Catholic and they have a Nativity Scene in their home during the Christmas season. He had no objection to such secular aspects of the Denver display as Santa Claus, reindeer, the Christmas tree and others because to him they simply represent the winter solstice season.

A clinical psychologist with an expertise in child psychology testified that in her professional opinion such a public display of apparent governmental support of a majoritarian view has negative effects on the children in religious minority families because it tends to encourage prejudice among the majority, and because it encourages self-degredation and diminished self-esteem among the minority. She said that the parents of children in religious minority families, in attempting to deal with the conflicts which confront their children during the Christmas season, often emphasize the neutrality of government to ease the pressure of peer conflict. Any weakening of that neutrality has an adverse effect upon that effort. She also testified that children function cognitively in a way which is much more rigid than with adults and that what may be benign to an adult would be very substantial to children. On cross-examination, she opined that when children view the Denver Christmas display, the Santa Claus and reindeer scene would have the most impact on Christian children; but that the creche would have the most impact on children of religious minorities. The psychologist, who is Jewish, also offered her personal view that the Nativity Scene was somewhat offensive and frightening because she saw it as an affirmation of the religious belief of a particular group by a government, which should be neutral, and because to her it was a reminder of consequences from more serious violations of neutrality in world history.

Another professor of religious studies, who is an ordained Episcopal priest, affirmed the accuracy of the testimony that the date for Christmas was established in the Fourth Century and that the date selected had been the time for a pagan celebration of the birth of the Invincible Sun. He too saw the creche as the symbol of the incarnation of God in Christ, and he described Christmas symbols such as Santa Claus, lights, trees, and others as different from the Nativity Scene because they are decorations which are not universally Christian. He called them mere "frosting on the cake" and the "cake is the creche." Thus, those items should be considered tangential, with the Nativity Scene being central.

A Quaker lawyer saw the 1978 Denver display, including the Nativity Scene, as the payment of tax money to put up a religious symbol, which some find contrary to their beliefs, and as giving an impression of implicit endorsement of Christianity over religious beliefs which do not focus on Christ. Her testimony was that Christ is recognized in her faith and that while Jesus is also an important historical figure, it is impossible to separate the religious role from the historical influence. She had no difficulty in considering Santa Claus as a totally secular symbol, even though that symbol of spirit and generosity evolved from Saint Nicholas, a Christian figure.

A computer scientist, who is a Unitarian, saw the entire display as crassly commercial and inartistic. He also saw it as participation by Denver in a religious observance, contrary to the separation of church and state, which Unitarians have urged as a basic tenet since the Middle Ages. He said that he was raised as a Roman Catholic in Europe; that in his home the family kneeled and prayed in front of a creche which had been blessed by a priest; and that he had been taught to consider the scene to be sacred.

A retired Baptist minister testified to the importance of separation of church and state in Baptist polity, remembering that Baptist colonists had experienced persecution, and that Roger Williams had established the Providence Plantation for religious freedom through such separation. The minister said that Baptists see the Nativity Scene as a religious symbol and that there was no other way to interpret it. In his opinion, Jesus Christ could not be compared to anybody else in the world.

The Mayor of Denver was called as a witness by the plaintiff. He testified that the Christmas display at the City and County of Denver Building had always been paid for through funds appropriated in the budgetary process and that the purpose was to induce people to come into downtown Den-

ver to spend money with merchants. He also stressed the importance of the long-standing tradition which he believed constituted good public relations for the image of the City and that the Nativity Scene demonstrated the historical origin of Christmas. The creche has religious significance for the Mayor personally and he expressed the hope that it would have such significance for others. He said that he had no opinion as to what it might mean to persons who do not have a religious belief in Jesus Christ.

It is important to recognize the limits of the issue which is now before this court. In this case, no one has challenged the observance of Christmas as a national holiday; no one has claimed that Denver must not maintain the tradition of the annual lighting display; no one has attacked the tenets of any religious beliefs; no one has sought to prevent or limit the use of the Nativity Scene or any other religious symbols in churches, homes, or on any private property; and no one has sought to secularize our society. Those who appear for the plaintiff here recognize the importance of religion in our national history, and the American Civil Liberties Union has always strongly supported the freedom to exercise religious beliefs without regard for their popularity.

What is being asserted in this case is the danger to that freedom resulting from any encroachment of the power of government into the pulpit. The Supreme Court and the lower courts of the United States have long struggled with the tensions between the establishment and free exercise clauses of the First Amendment in a wide variety of factual circumstances. The natural tendency toward attempting to resolve these questions by reasoning from first principles and Framers' intent becomes increasingly attenuated as government grows more intrusive and the social order becomes more complex and pluralistic. It is difficult to imagine James Madison anticipating that municipal officials would use public funds on a religious display for the purpose of enticing people to come into a commercial area and spend their money with private merchants.

Where there is less consensus on cultural values, including religious precepts, there is greater need for restraint in the use of the coercive power of the plurality in the exercise of authority by those who obtain governmental office by popular election. There are no differences in degree of the denial of constitutionally protected liberties and no governmental act can be approved on the ground that it is only a little bit unconstitutional.

The First Amendment provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." These principles have been incorporated by judicial decision into the Fourteenth Amendment due process clause, and are fully applicable to state as well as federal action. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

As the Tenth Circuit Court of Appeals has noted, the Supreme Court has "treated the Establishment and Free Exercise Clauses under various factual situations with perplexing diversity of views." *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 31 (1973). This difficulty in interpreting the amendment results from the fact that "[t]he sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute." *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). While that objective must be identified in the context of a world far different from that of the Framers, its roots lie in the historical perceptions that "both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere," *McCollum v. Board of Education*, 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948), but that "a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962).

With these lessons in mind, the Supreme Court has held that:

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.

*Everson v. Board of Education*, 330 U.S. at 15–16, 67 S.Ct. at 511. Moreover, while recognizing that they "are no more than helpful signposts", *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973), the Court has posited three tests to determine when government action escapes the prohibitions of the establishment clause:

First, the [action] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; finally, the [action] must not foster "an excessive government entanglement with religion".

*Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

■ In determining whether the "principal or primary effect" of particular government action advances or inhibits religion, the courts are not required to parse one "primary" effect of a given activity from its other effects and analyze only the former. In *Committee For Public Education v. Nyquist*, 413 U.S. 756, 783–784, n.39, 93 S.Ct. 2955, 2971 n.39, 37 L.Ed.2d 948 (1973), the Supreme Court held:

We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a "primary" effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion. . . . Any remaining question about the contours of the "effect" criteri-

on were resolved by the Court's decision in *Tilton* [*v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790], in which the plurality found that the mere possibility that a federally financed structure might be used for religious purposes 20 years hence was constitutionally unacceptable because the grant might "*in part have the effect of advancing religion.*"

Rather, the Court indicated that benefits conferred upon religious institutions must be "indirect", "remote" or "incidental". *Id.* at 771, 93 S.Ct. 2955. As Professor Tribe has noted, "[t]his shift is significant, for the remote-indirect-and-incidental standard plainly compels a more searching inquiry, and comes closer to the absolutist no-aid approach to the establishment clause than the primary effect test did." Tribe, *American Constitutional Law*, 840 (1978).

■ The City has argued that its purpose in including the creche in the Christmas Display is sufficiently secular, in that the entire display is designed to draw tourists and residents alike into the downtown business district, and to improve the City's national image. This contention is troublesome, not only in light of the Mayor's expressed hope (but not "intent") that viewers would see religious significance, but because it fails to explain the importance of the creche itself to such a commercial purpose. If the City's intent is indeed to use an appeal to sectarian religious sentiments to attract people into the city, that purpose might well be constitutionally impermissible. It is not necessary to inquire further into the City's purpose, however, for an analysis of the "effects" and "entanglement" establishment clause tests is dispositive of this case.

While the indisputably religious nature of the creche is not in itself determinative as to whether its inclusion "advances or inhibits religion", it is highly significant. For whatever may be the governmental purpose behind inclusion of the creche, it is the symbolic nature of that act, as publicly perceived, which may have an advancing or inhibiting effect. *See*, discussion by Tribe, *supra*, at 843–844, of the importance of

symbolical impact in the Supreme Court's establishment clause cases.

The convincing and uncontroverted evidence presented to this court was that the City's placement of the Nativity Scene on the front steps of the City and County Building (the very building to which the citizens must turn for government) is widely viewed as an affirmation and support of the tenets of the Christian faith. On this issue there could be no more persuasive evidence than the letters and petitions sent to the Mayor of Denver when the requests for removal were made in 1978, and this year. They are in evidence as Plaintiff's Exhibit 3. Consider these quotations from those letters:

. God and Christ in our lives has always been what America is all about . . . .

It seems to me that if we are a Christian nation that we should do something to demonstrate that fact.

. . . as a good Christian Mayor.

. . . Christmas is a Christian holiday.

. . . upholding the symbolism of the religious majority.

Our country was founded on God; if she [Madalyn Murray O'Hair] doesn't like our religious beliefs she's free to go to another country. ·

. . . God being always the head of our nation.

This country was founded on Christianity so why allow some non-Christian to dictate to the majority, and allow the infiltration of such ideas to occur in our country.

. . . in God we trust is our land's freedom of belief.

Its because of our Christian beliefs our Country has maintained its freedom.

We cannot deny our religious heritage and I think the government can reflect the majority's opinion.

We as taxpayers have a right to express to the people that we are Christians

. . . .

America was founded on Christianity and freedom of religion . . . .

Certainly the people writing those letters perceive the Nativity Scene in the Denver display as a religious symbol and an affirmation of their sincere religious beliefs. They are representative of the sentiments expressed by the hundreds of others whose strong convictions moved them to write letters and the thousands who signed the petitions.

Because the decision to include the creche in the 1979 display was made with awareness of this public sentiment, it is somewhat difficult to accept the view that the city officials' intent is only to further commercial interests in downtown Denver.

The convincing expressions by various witnesses of their feelings of "discomfort", "anger", "fear" and "being left out" upon viewing the scene, coupled with the expert testimony of the psychologist as to the effects upon minorities of symbolic governmental alignment with the majority, strongly suggest that the Nativity Scene may well have the effect also of inhibiting religious beliefs (non-beliefs) of viewers.

These advancing and inhibiting effects are far from being "remote, indirect or incidental". Indeed, the evidence suggests that whatever commercial and public relations benefits derive from inclusion of the creche in the Christmas Display, they are themselves incidental to the "principal or primary" religious effect which it has on viewers. At any rate, the proven depth of response clearly establishes that the City Hall display of the Nativity Scene is publicly perceived as a religious symbol within the definition of the defendant's expert witness and that compels the conclusion that the governmental actions of erecting, maintaining and displaying that symbol on public property at public expense is violative of the protection of minority views provided by the establishment clause of the First Amendment.

The mere fact that the rest of the Christmas display is secular, and so recognized, does not mitigate this constitutionally objectionable result. The Supreme Court has recognized that "[a]id normally may be

thought to have a primary effect of advancing religion . . . when it funds a specifically religious activity in an otherwise substantially secular setting." *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). Indeed, one of the most important inquiries in application of the "effect" test has been whether the secular and religious aspects of the challenged activity were sufficiently separable. *See, Roemer v. Board of Public Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), (Blackmun, J., *for plurality* at 755, 96 S.Ct. 2337, White, J., *concurring* at 768, 96 S.Ct. 2337; *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). The problem created by the City's placement of the creche on the steps of the City and County Building stems largely from the fact that the secular and religious aspects of the display cannot be separated, and indeed, the latter may be intentionally presented so as to promote the former.

In *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970), the Supreme Court stated its concern—which has since become a separate test under the establishment clause—that "an excessive government entanglement with religion" be avoided. In succeeding years, this concern has resolved itself into a dual inquiry: First, government must not foster what Tribe, *supra* at 866, has referred to as "administrative entanglement", that is, institutional interference between church and state. In this regard, the Supreme Court has held:

> In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority.

*Lemon v. Kurtzman*, 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971).

The City government has acted in this case in a manner which many reasonably perceive to ally it officially with churches following Christian beliefs. It has provided the total design, planning, funding, space, placement and maintenance for display of an inherently religious symbol. Even if there has never been any communication or contact between the City and any religious authority, the *perception* of such an affiliation in the minds of the people actually creates a relationship between the two which is offensive to the Constitution.

The second strand of the "entanglement" test is that derived from the Supreme Court's concern with "continuing political strife over aid to religion." *Committee For Public Education v. Nyquist*, 413 U.S. 756, 794, 93 S.Ct. 2955, 2976, 37 L.Ed.2d 948 (1973). The Court elaborated upon this concern in *Lemon v. Kurtzman*, 403 U.S. 602, 622, 91 S.Ct. 2105, 2116, 29 L.Ed.2d 745 (1971) while considering a program of public assistance to parochial schools:

> Ordinarily, political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. . . . The potential divisiveness of such conflict is a threat to the normal political process.

The Court's cases in which this "divisiveness" element of "entanglement" has played a role have involved circumstances quite similar to those engendered by the City's actions in this case. The tone and content of the letters and petitions to the Mayor contained in Plaintiff's Exhibit 3 and the testimony of the witnesses in this court are clear demonstrations of a division of the Denver community resulting from inclusion of the creche in the Christmas display. The emotional intensity which is apparent in the conflict which has brought this case to court demonstrates once again the wisdom of James Madison who expressed his fear in the famous *Memorial & Remonstrance Against Religious Assessments*, that government involvement with religion would "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced

among its several sects." (Reproduced in appendix to opinion of Rutledge, J., in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).)

The divisiveness caused by the City's use of the creche is, moreover, of a particularly troublesome kind, for in this case, as in *Lemon, supra* 403 U.S. at 623, 91 S.Ct. at 2116, we are "confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified."

Some of the letter-writers have offered to donate money to pay for the erection and maintenance of the creche in the Christmas display to avoid the use of tax revenues for that purpose. While the use of public funds is one of the elements involved in the question of entanglement, the elimination of such support is not, in itself, determinative. If the response to this decision is an attempt to replace public with private support, and so to come within the free exercise clause of the First Amendment, care must be taken to comply with those principles of neutrality mandated by the establishment and equal protection clauses of the Constitution and set forth in *O'Hair v. Andrus,* 198 U.S.App.D.C. ——, 613 F.2d 931 (1979).

Just as the defendant has relied on only one expert witness to support its position, it has presented only one case which it claims to have precedential value, *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973). There, the Salt Lake City and Salt Lake County Boards of Commissioners had "informally permitted" the Fraternal Order of Eagles to erect a granite monument on city and county courthouse grounds. The monolith was inscribed with the Ten Commandments and other symbols, including the "all Seeing Eye of God", the Star of David, letters from the Hebraic alphabet, "Christ's Monogram" (a letter "P" superimposed on the letter "X"), and the "Order of Eagles". The installation and maintenance of lighting equipment to illuminate and enhance the display were authorized at public expense.

The court found that the Ten Commandments or "Decalogue "has substantial secular attributes", is "an affirmation of at least a precedent legal code", and contains "accepted precepts, as a foundation for law". Moreover, it stressed the fact that the Order of Eagles is not a religious organization and concluded that "the monolith is primarily secular, and not religious in character; that neither its purpose or effect tends to establish religious belief." *Id.* at 33–34.

The facts and circumstances comprising this case are strikingly different from those presented in *Anderson*. Here, the City itself has taken sole responsibility for purchasing, erecting and displaying the creche. Thus, while it was clear in *Anderson* that the Eagles had erected the monument, this crucial symbolic element requires a different result here. Additionally, the monument in *Anderson* contained a variety of religious and non-religious symbols, all related to the theme of law and justice appropriate to the courthouse setting. This case, however, involves a religious symbol central to the beliefs held by those in a group of organized religious institutions. It must be remembered that "the narrowness of the benefited class" is an important element in assessing offensiveness under the establishment clause. *Committee For Public Education v. Nyquist*, 413 U.S. 756, 794, 93 S.Ct. 2955, 2976, 37 L.Ed.2d 948 (1973). Moreover, the court in *Anderson* found that the symbol which was the focus of the controversy—The Decalogue—had significantly secular impact. No such finding could reasonably be made with respect to the Nativity Scene.

There are additional reasons, moreover, for rejecting the defendant's argument that *Anderson* is controlling in this case. Since the decision in *Anderson*, the Supreme Court has made it clear that government action may be unconstitutional even if it has secular effects which may be deemed "primary". *See*, discussion of this development *supra*, and *Nyquist, supra*, 413 U.S. at

**532**

783–784 n.39, 93 S.Ct. 2955. This court has found that however the religious effects of the creche may be characterized in terms of quantitative primacy, they are certainly not "remote, indirect or incidental", and the Constitution is thus violated. Finally, the Circuit's analysis in *Anderson* did not include consideration of the recently developed "entanglement" inquiry discussed above, and the record there does not indicate what importance such factors might have had in the court's decision. At any rate, consideration of the "excessive governmental entanglement" in religious affairs caused by inclusion of the creche requires its removal in this case. For a recent decision involving a more closely analogous, though still distinguishable factual context, *see, Allen v. Morton*, 161 U.S.App.D.C. 239, 495 F.2d 65 (D.C.Cir. 1973).

Upon the foregoing, which shall constitute the findings of fact and conclusions of law herein, it is now

ORDERED, that the defendant City and County of Denver is enjoined from the inclusion of the Nativity Scene in the Christmas display at the City and County Building, and it is

FURTHER ORDERED, that the Nativity Scene which now stands on the front steps of that building shall be removed therefrom within forty-eight hours, and it is

FURTHER ORDERED, that the plaintiff shall have and recover from the defendant, a judgment for costs and attorney's fees in an amount to be determined after the filing of an appropriate written claim for such costs and fees within thirty days from the date of this order, and it is

FURTHER ORDERED, that the injunction hereby ordered and the claim for costs and attorneys' fees shall be considered to be separate claims within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure, and there being no just reason for delay in the entry of judgment on the order for an injunction, it is expressly directed that the Clerk of this court shall forthwith enter such judgment, making this order appealable immediately.