Deyan Ranko BRASHICH, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Alan Sagner, John Doe # 1 Through 10, Inclusive, names being fictitious but to be supplied at completion of discovery, Roman Catholic Church of Our Lady of The Skies, the Council of Churches of the City of New York, Inc. and The International Synagogue and Jewish Center, Inc., Defendants.

Civ. No. 77–6159.

United States District Court,
S. D. New York.

Dec. 20, 1979.

---

Deyan Ranko Brashich, John W. Finley, Jr., Jay B. Hashmall, Edith Blumberg, Brashich & Finley, New York City, for plaintiff.

Patrick J. Falvey, New York City by Milton H. Pachter, Sholem Friedman, New York City, for defendants Port Authority and Alan Sagner.

John H. Kearney, Kevin M. Kearney, Hurley, Kearney & Lane, Brooklyn, N. Y., for defendant Roman Catholic Church of Our Lady of the Skies.

Mitchell Salem Fisher, Kenneth D. Kemper, Elizabeth Bates, Mitchell Salem Fisher & Kemper, New York City, for defendant Intern. Synagogue and Jewish Center, Inc.

George M. Duff, Jr., Holtzman, Wise & Shepard, New York City, for defendant Council of Churches of the City of New York.

## OPINION AND ORDER

PIERCE, District Judge.

Plaintiff sues for declaratory and injunctive relief, claiming violations of the First and Fourteenth Amendments of the United States Constitution. He sues pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343(3) and (4). Plaintiff asserts that governmental leasing of land to religious groups for the erection of religious chapels, and the presence of three religious chapels at John F. Kennedy ("JFK") Airport, is a violation of the Establishment Clause.[1] This action was tried to the Court, and in accordance with Rule 52(a) Fed.R. Civ.P., the following shall constitute the Court's findings of fact and conclusions of law.

### THE FACTS

Plaintiff, Deyan Ranko Brashich, is a citizen of the United States; he has been a resident of New York State for eight years; and he is a user of JFK's facilities (Tr. 24).[2] Defendant Port Authority of New York and New Jersey is a public entity which was created in 1921 by a congressionally-approved compact between the states of New York and New Jersey; the Chairman of the Port Authority is defendant Alan Sagner. Among other things, the Port Authority operates the public facility known as JFK Airport—it does so under color of state law

---

1. The First Amendment provides in pertinent part: "Congress shall make no law respecting an establishment of religion . . .". It is applicable to the states through the Fourteenth Amendment.

2. "Tr." refers to the transcript of the trial.

(Tr. 17).[3] The City of New York (not a party to this action) is the owner in fee of the land on which the Airport is located—4,620 acres—and which it leased to the Port Authority for an indefinite period of years.[4] The Port Authority, as an independent autonomous entity, raises its own revenue and relies upon its own resources without dependence upon state tax revenues. It lacks the power to levy taxes and, without legislative approval, the power to pledge the credit of either the State of New York or the State of New Jersey (N.Y.Unconsol. Laws § 6408) (McKinney). The Port Authority finances its projects primarily through the sale of bonds to the investing public.

The Central Terminal Area of JFK—some 900 acres—is city-like in nature and is located approximately at the center of the Airport. There are a variety of facilities in the area, including: nine airline terminals, a control tower, banks, barber shops, a beauty salon, book and stationery stores, a cutlery store, and gift shops; there is a 24-hour medical service, a dental service, a pharmacy, vehicle parking and automobile service stations, a central heating and refrigeration plant, and there is a chapel plaza with three chapels. More than 40,000 employees work at JFK Airport. In 1978, the Airport accommodated approximately 22 million passengers. The distance from the terminal area to the perimeter of the Airport is approximately two miles.

The three chapels in controversy are located on a plaza in the middle of the Central Terminal Area on the north side of a lagoon; it is separated from the terminals and passenger services by a principal roadway. By reason of this separation, the chapels do not interfere with the operation and functioning of the Airport.[5]

Prior to 1952, under the auspices of an organization known as the Catholic Guild of New York International Airport, religious services were conducted on Sundays in the terminal building at the Airport. In 1952, a group of Airport employees sought to lease land accessible to this terminal building for the purpose of erecting a chapel to provide Catholic religious services to Airport employees and the travelling public. On November 6, 1952, the Port Authority authorized the issuance of a permit to the Roman Catholic Church of Christ the King (hereinafter "Catholic") for the construction of a chapel.[6] At the same time, the Port Authority announced that it would enter into similar arrangements with any other religious groups that might be interested in constructing a chapel at the Airport.[7]

On March 26, 1953, the Port Authority issued a one year space permit (a form of lease) to Catholic pursuant to the November 6, 1952 authorization. As in all of its leases, the permit did not reserve title in the permittee to any improvements made on the land. This was in accord with the Port Authority's lease with the City of New York, which provides that title to any and all buildings, structures, and additions to the JFK Airport land is to vest in the City of New York immediately upon annexation to the land (Tr. 36). The original permit arrangement contemplated a chapel of a temporary and moveable nature; Catholic estimated the cost of constructing such a chapel at $25,000.

On March 12, 1954 the permit was extended indefinitely and, later that month, the Port Authority approved the erection

---

3. The airport was originally named New York International Airport; this was later changed to Idlewild International Airport; and, finally, to John F. Kennedy International Airport.

4. Plaintiff's trial Exhibit 1, Lease Agreement dated April 17, 1947 at p. 8.

5. However, on several occasions the chapels have been utilized to provide facilities or services in emergency situations, such as air accidents or bomb threats. (Tr. 267–68).

6. The Roman Catholic Church of Christ the King is the predecessor of the Church of Our Lady of the Skies, a named defendant herein. The latter church was incorporated in 1967 and was assigned the lease between the predecessor Church and the Port Authority entered into on March 29, 1963; thus, the Catholic chapel at JFK bears the name of Our Lady of the Skies.

7. Plaintiff's trial Exhibit 15, Operation's Committee Minutes dated January 4, 1962 at p. 4.

by Catholic of a structure of a more permanent nature, namely, a one-story steel and masonry structure with brick walls. Construction of this chapel was completed in 1955. It was built on one quarter acre of land which was leased at a rental rate of $325 per annum based upon a rate of $1,300 per acre per annum.[8] The permit provided that the permittee was to pay the costs of construction and maintenance—no limit was imposed on the cost of construction. The Port Authority agreed to pay the cost of bringing utilities to the site.

On June 6, 1957, and March 5, 1959, respectively, the Port Authority granted the applications of defendants International Synagogue and Jewish Center, Inc. (hereinafter "Jewish") and the Council of Churches of the City of New York, Inc. (hereinafter "Protestant")[9] to lease land at JFK. The lease agreements were similar to the earlier leasing arrangements which had been made with Catholic. These new leases were to each cover approximately one acre of land at the rental rate of $1,300 per acre per annum, and were to provide for twenty year terms. It was anticipated by the Port Authority's Committee on Operations that the then existing space permit with Catholic would be terminated and replaced by a similar long term lease.[10]

On December 22, 1958, a lease was signed with the defendant Jewish. At about the same time, a lease was drafted pursuant to negotiations undertaken with defendant Protestant, although it was not signed at that time.

In May, 1960, after the plans and specifications of the Jewish and Protestant chapels had been completed and approved, the Port Authority, as a result of a growing need for additional airline passenger terminals and increased vehicular parking areas, redesigned its master plan for JFK Airport. In the new master plan, the area which previously had been leased for the chapels was redesignated for other purposes and the three religious groups were assigned to the present site. Since this necessitated relocation solely for the benefit of the Port Authority, and since the three religious groups had incurred certain costs of construction or planning for chapels at the original site, the Port Authority decided to reimburse them accordingly. The chapel of defendant Catholic at the old site had to be demolished under the new master plan. Consequently, the payment of $260,000 for the old chapel was authorized by the Port Authority as full compensation for reconstruction costs. After negotiations with Protestant and Jewish, each of which had incurred certain planning costs but had not yet actually commenced construction, an agreement was reached for the payment of $25,000 to each for planning costs which had been incurred.

On March 29, 1963, the current leases between the Port Authority and the three religious groups for the new sites were formally executed. The terms of the new leases were almost identical to those negotiated with respect to the earlier ones. The new leases provided for approximately one acre of land for each religious group for a term of twenty years to commence at the point of completion of the chapels. The lease rate was again set at the rate of $1,300 per acre per annum. The lessees were required to pay their own construction and utility service costs, although the Port Authority paid the costs of providing paving and utilities to the new site (Tr. 120–26), and reimbursed the groups for costs incurred for the central heating plant connections (Tr. 128). The new chapels are located on the north side of the lagoon in the Central Terminal Area and access to them is much less favorable than it had been at the old site since, for safety reasons,

---

8. There was testimony at trial that the lease rental rate was predicated upon a document known as the Dewey Memorandum of 1949, which covered leases executed between nine airlines and the Port Authority. See plaintiff's trial Exhibit 3.

9. Defendant Council of Churches of the City of New York administers the Protestant chapel at JFK.

10. Plaintiff's Exhibit 15, Operation's Committee Minutes, *supra*, at p. 5.

there is no direct access from the high-speed roadway to the chapel area. The new chapel plaza site was originally designated by the Port Authority for aesthetic use (Tr. 232). The old site is currently being used for a passenger terminal (Tr. 235).

Since the final construction of the chapels, the Port Authority, pursuant to its policy as a landlord of attending affairs given by its tenants (Tr. 139–42), has on occasion, bought tickets to various social/fund-raising events sponsored by the religious groups.[11] The Port Authority, at its expense, has provided directional and parking signs at the Airport giving instructions to persons interested in visiting the chapels, pursuant to a Port Authority policy of paying for all airport directional signs for its tenants (Tr. 131). Plaintiff contends that these expenditures by the Port Authority constitute subsidies to the religious groups.

Plaintiff brings this suit to challenge the constitutionality of the Port Authority's actions with respect to the chapel leases, and the presence of the religious chapels at the Airport.

## DISCUSSION

### I. *Plaintiff's Standing to Sue*

Although the defendants raised the issue of plaintiff's standing to sue in their pleadings, formal motions regarding the issue were made in the form of post-trial motions, even though standing is a threshold issue which should be addressed before a court reaches the merits of a case.[12]

Plaintiff asserts standing to sue as an eight year New York State resident and a citizen of the United States who "has on numerous occasions visited and departed from John F. Kennedy Airport." (Tr. 24).

He claims to be adversely affected by the Port Authority's actions in leasing the land to the religious defendants and permitting them to build religious edifices on the land. Initially, plaintiff alleged that his interests were adversely affected due to his membership in the Serbian Eastern Orthodox faith, however, he later withdrew that allegation and all his references to his religious affiliation from this case.[13] Plaintiff relies upon *Anderson v. Salt Lake City Corporation*, 475 F.2d 29 (10th Cir.), *cert. denied*, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) which held that plaintiffs have adequate standing "based upon their beliefs about religion to question whether those beliefs have been infringed upon by an alleged use of public property for religious purposes." 475 F.2d at 31.

■ The standards for standing set forth in *Anderson, supra,* have not been addressed in this Circuit. In order to acquire standing under the Establishment Clause pursuant to 42 U.S.C. § 1983, as for any other claim of "a deprivation of a right secured by the Constitution and laws", the plaintiff must meet the test of constitutional standing which requires a "real and immediate injury" to the plaintiff. *Rizzo v. Goode*, 423 U.S. 362, 371–72, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). Under Article 3 of the United States Constitution, "standing to sue" means that a party must have a sufficient stake in an otherwise justiciable controversy. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). "Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' *Baker v. Carr,*

---

11. According to the evidence, these events were attended in the years 1972 through 1975, and the cost of tickets totalled $1,300. Plaintiff's Exhibit 50.

12. Defendants did make motions to dismiss on other grounds; these motions were denied.

13. Plaintiff originally claimed violations of both the free exercise clause and the establishment clause; he also asserted standing as a member of the Serbian Eastern Orthodox Church. The Port Authority attempted to have a meeting with plaintiff to discuss the possibility of accommodating the Serbian Eastern Orthodox Church at JFK. Plaintiff did not attend the scheduled meeting. Plaintiff later amended his complaint to withdraw the free exercise violation claim. At the commencement of trial, he requested that all of his references to his own religion be withdrawn. (*See* Tr. 12).

369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context . . .'" 405 U.S. at 732, 92 S.Ct. at 1364.

The Court notes first that plaintiff does not assert standing nor allege injury as a taxpayer. Moreover, even if plaintiff's papers were liberally construed to include an allegation of taxpayer standing, plaintiff would still fail to acquire standing since he has not alleged nor proved the required nexus between himself as a taxpayer and expenditures by the Port Authority in violation of the Establishment Clause. The Port Authority has no authority to levy taxes, and plaintiff has not shown it to have been the recipient of funds from either the States of New York or New Jersey. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967), a leading case addressing taxpayer challenges to government expenditures in violation of the First Amendment, held that in order to acquire taxpayer standing: "First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." 392 *Id.* at 102. Since there has been no allegation and no showing that the Port Authority has received tax money from the States, the required nexus between plaintiff as a taxpayer, and the alleged constitutional infringement due to the Port Authority's actions has not been established.

In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Court denied standing to a taxpayer to contest the congressional expenditure for maternity benefits. In *Mellon*, the Court stated that a party challenging congressional expenditures "must be able to show, not only that the statute is invalid, but that he has sus-

tained some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." 262 *Id.* at 488, 43 S.Ct. at 601. Plaintiff has not alleged any direct or indirect *economic* injury. Nor has plaintiff alleged or shown that the termination of any economic benefit allegedly given to defendants would accrue to his benefit.

Here, plaintiff apparently relies upon an assertion of *non-economic* injury for the purpose of standing, as per *Anderson v. Salt Lake City, supra*. The Court notes that *Sierra Club v. Morton, supra*, stated that standing could be based upon intangible interests such as aesthetics, conservation and recreational concerns.[14]

In *Anderson*, the plaintiffs challenged the Salt Lake City and Salt Lake County Boards of Commissioners' maintenance of a monolith at the City's and County's expense. The monolith was erected with the Boards' permission in a prominent place near the city-county courthouse entrance. The plaintiffs in *Anderson* asserted standing as residents and taxpayers of Salt Lake County. Defendants challenged plaintiffs' standing asserting a lack of a proper nexus between plaintiffs' status and the alleged constitutional infringement and a failure to show any direct injury. The Circuit Court did not rule on plaintiffs' claim of standing as residents and taxpayers but instead held that the "requisite standing is clearly conferred by non-economic religious values when the plaintiffs assert a litigable interest under the Establishment and Free Exercise Clauses of the Federal Constitution." 475 F.2d at 31.

In *Sierra*, the Court denied standing to the plaintiff because it had not demonstrated that it would be "adversely affected" or "aggrieved" within the meaning of the APA. 405 U.S. 739, 92 S.Ct. 1361. The Court held that "broadening the categories

---

14. *Sierra Club* involved a challenge to federal agency action. The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, makes specific provision for challenges by citizens to administrative actions. A statute may create new interests and rights and thus give standing to one who would otherwise be barred by lack of case or controversy. *Scenic Hudson Preservation Conference v. Federal Power Commission*, 354 F.2d 608 (2d Cir.), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1965).

of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." 405 U.S. at 738, 92 S.Ct. at 1368.

Plaintiff here has alleged no injury peculiar to himself. He has not alleged or shown any direct economic or non-economic injury. For instance, he has not alleged that he has been denied any type of prior use, see *Save The Courthouse v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975), nor that he is being denied any right as a member of the public to use of public lands, see *Allen v. Hickel*, 138 U.S.App.D.C. 31, 424 F.2d 944 (D.C.Cir. 1972). The plaintiff herein has fallen short of alleging "the type of concrete and direct injury requisite to invocation of federal judicial power . . ." *American Jewish Congress v. Vance*, 575 F.2d 939, 188 U.S.App.D.C. 58 (D.C.Cir. 1978). Thus, the plaintiff here is found to lack standing to sue.

II. *Plaintiff's Claim that the Port Authority has Established Religion*

█ Even if plaintiff had demonstrated standing to sue, he has not shown that the Port Authority has "established religion." The First Amendment contains two religious clauses; it requires that the government neither "establish" religion, nor prevent the "free exercise" thereof. The objective of the First Amendment is to require the government to maintain a neutral role with respect to religion, and to avoid either state sponsorship of or interference with religion. In reviewing First Amendment challenges, it is necessary for the Court to strike a balance between the right to "free exercise of religion", and the prohibition of state "establishment of religion . . . both of which [clauses] are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." *Walz v. Tax Com-*

*mission*, 397 U.S. 664, 669, 90 S.Ct. 1409, 1410–1411, 25 L.Ed.2d 697 (1969).

The First Amendment does not require religious hostility, and it has long been recognized that "[w]e are a religious people. . . ." *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954; *Walz, supra*, 397 U.S. at 672, 90 S.Ct. 1409. In *Zorach*, the Court held that the Establishment Clause does not mean: "that in every and all respects there shall be a separation of Church and State. . . . Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly." 343 U.S. at 312, 72 S.Ct. at 683.

█ In the instant case, the Port Authority has not established religion, but has only made accommodations for religious practices. As earlier stated, JFK Airport is a massive facility covering over 4,500 acres, with an enormous number of people using the facility. The Port Authority has made many provisions to accommodate the Airport's large population of travellers, visitors and employees. Within the Airport complex, provision has been made for medical, dental and pharmacy services; also there are hotel, parking, shopping and banking services. Providing land for the erection of religious chapels is merely a further accommodation by the Port Authority to serve the convenience of those who use the Airport. Contrary to plaintiff's contention, the Port Authority does not sponsor, subsidize or interfere with the religious groups which operate the chapels at the Airport. Nor does it advise them on the conduct of their institutions.[15]

Plaintiff has not shown that the Port Authority established religion by its actions in connection with leasing of land to the three religious groups herein, or their erection of the three chapels. Plaintiff has not shown "governmentally established religion or governmental interference with reli-

---

15. Defendants produced evidence at trial that the three religious groups pay their own utility costs for their respective chapels—just as do other airport tenants. Also there was evidence presented that the land probably would have remained vacant, in light of the designation of the land for aesthetic purposes, and the lack of easy access to the area. The Port Authority presented evidence at trial that it considers it too dangerous to have an exit off of its high speed roadway into the area where the chapels are presently located.

gion", the two standards of neutrality for First Amendment purposes as expressed in *Walz, supra,* 397 U.S. at 669, 90 S.Ct. at 1412. On the facts presented herein, the Port Authority has made accommodations for religion, it has not established religion.

The declaratory and injunctive relief sought by the plaintiff is hereby denied. All motions for attorney fees are denied. The complaint is dismissed with costs to be taxed against the plaintiff. The Clerk of the Court is hereby directed to enter judgment in favor of the defendants.

SO ORDERED.