**SUMMUM, a corporate sole and church; and R.L. Zefferer, Plaintiffs,**

v.

**CITY OF OGDEN, a municipal government entity; Glenn J. Mecham, Mayor; Jesse M. Garcia, Member, City Council; Kenneth J. Alford, Member, City Council; Fasi M. Filiaga, Member, City Council; Rick J. Mayer, Member, City Council; John W. Wolfe, Member, City Council; Ralph W. Mitchell, Member, City Council; and Garth B. Day, Member, City Council, Defendants.**

**Civil Nos. 1:98–CV–0150J, 1:99–CV–0031J.**

United States District Court, D. Utah, Northern Division.

Jan. 31, 2001.

Brian M. Barnard, James L. Harris, Salt Lake City, UT, for plaintiffs.

Richard A. Van Wagoner, Allan L. Larson, Andrew M. Morse, Snow Christensen & Martineau, Salt Lake City, UT, for defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

Plaintiff Summum, a self-professed church, seeks to make a gift to the City of Ogden of a stone monument containing thereon seven aphorisms characterized by it as religious in nature.[1] It wants to have a stone etched with its seven tenets placed in the Ogden Municipal Gardens.

Ogden City, while appreciative of the good will of the donor, rejected the gift.

Summum seeks an order of this Court directing Ogden City to accept the gift. It asserts that Ogden City has accepted other monuments, and particularly one from the Fraternal Order of Eagles that it characterizes as religious in nature, thereby creating a limited public forum for such displays. (See Complaint, filed March 11, 1999 (dkt. no. 1), at 12, 13.) It merely wants to have its religious say.

The Court heard arguments with respect to the cross motions for summary judgment on October 15, 1999, and again on December 3, 1999. Brian M. Barnard and James L. Harris appeared on behalf of the plaintiffs and Richard A. Van Wagoner appeared on behalf of the defendants.

The Court having reviewed the parties' motions, memoranda and supplemental materials, and having heard oral argument from counsel and after fully considering the same, hereby denies Plaintiffs' motions and grants Defendants' motion.

### FACTUAL BACKGROUND

#### I. The Parties and the Controversy

Plaintiffs filed a complaint in this Court on March 11, 1999 seeking declaratory relief that defendants' conduct in rejecting a proffered gift violates the Free Expression, Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution and similar provisions of the Utah Constitution. Plaintiffs further seek an order allowing plaintiff Summum to erect and display a monument containing tenets of its faith in the Municipal Gardens of Ogden City. This matter was consolidated with a another action filed in *Freedom From Religion Foundation v. City of Ogden*, 1:98–CV–0150, which sought to have the Eagles' donated monument removed from the Ogden Municipal Gardens. After consolidation, the parties stipulated to the dismissal of the *Freedom From Religion Foundation*. That action was dismissed by court order dated May 20, 1999. The remaining parties filed cross-motions for summary judgment as to the remaining issues.

Summum is a corporate sole under the laws of the State of Utah since November 3, 1975, and qualifies as a religion under the Internal Revenue Code. Summum's world headquarters are located in Salt Lake City, Utah. Summum Bonum Amen Ra is the president of Summum, and there are others who serve as officers and directors. Seven principles are at the core of the Summum religion, which are the subject matter of the monument that Sum-

---

1. Ironically, the Summum aphorisms, devoid of their religious characterization, are completely secular in nature.

mum proposes to erect and display in the Ogden City Municipal Gardens. R.L. Zefferer is a resident of Weber County and a member of the Summum religion.

Summum and Zefferer filed this action under 42 U.S.C. § 1983 against the City of Ogden and individual members of the Ogden City Council for refusing to erect and display a donated monument in the Ogden City Municipal Gardens containing tenets of the Summum religion while continuing to display a monument containing a version of the "Ten Commandments" donated by the Eagles. The proposed Summum monument is similar in size, shape and design to that of the Eagles' monument. Summum offered the proposed monument as a gift to the City of Ogden and was willing to pay all of the costs associated with the monument's creation and installation.

The City of Ogden is a government entity and a governmental subdivision of the state of Utah. Pursuant to *Utah Code Ann.* 10–3–1 *et seq.*, Ogden City has delegated to Glenn J. Mecham, Mayor and Jesse M. Garcia, Kenneth J. Alford, Fasi Filiaga, Rick Mayer, John W. Wolfe, Ralph Mitchell, and Garth B. Day, Ogden City Council members, the administrative authority to determine whether displays or monuments will be placed on property belonging to Ogden City.[2]

A letter dated November 20, 1998, was sent to Glenn J. Mecham, Mayor of the City of Ogden and Glen H. Burton, Chair of the Weber County Commission, by Brian M. Barnard, on behalf of "several clients," requesting that the City and County remove the Eagles' donated monument located on the grounds of the City and County Building in Ogden, Utah.[3] The monument was not removed. On December 28, 1998, Freedom from · Religion Foundation, Inc., a Wisconsin corporation, and J. Dalley filed a complaint against the City, the Mayor and the Councilmen. The complaint alleged a violation of the Establishment Clause of the First Amendment. (*See* Complaint, filed December 30, 1998 (dkt. no. 1), at 3–5, 10.) The complaint was later consolidated with this action and dismissed by stipulation of the parties through counsel for plaintiffs in the remaining action. (See Order dated May 20, 1999 (dkt. no. 32).)

A letter dated March 2, 1999, was sent to Mayor Mecham by Summum Bonum Amen Ra, the President of Summum, seeking "permission of the City to place a monument on the grounds of the Ogden City and County Building." (*See* Exhibit R, Complaint, filed March 11, 1999 (dkt. no. 1).) The proposed monument was to contain seven principles, tenets of Summum's religious beliefs.[4] On March 9,

2. Matthew R. Godfrey has since replaced Glenn J. Mecham as Mayor of Ogden City. Rick Safsten and Mary Hall have since replaced Rick J. Mayer and Garth B. Day as Ogden City Council Members.

3. The City of Ogden is presently the sole owner of the grounds on which the Ten Commandments Monument is located.

4. The proposed monument contains the following inscription:
"Creation manifests when balance is perfected between the opposites. By applying high Law against lower laws, the Creation becomes divine."-Summum

THE GRAND PRINCIPLE OF CREATION
"NOTHING AND POSSIBILITY come in and out of bond infinite times in a finite moment."-Summum
THE PRINCIPLE OF PSYCHOKINESIS
"SUMMUM is MIND, Thought: The Universe is a Mental Creation."-Summum
THE PRINCIPLE OF CORRESPONDENCE
"As above, so below; as below, so above."-Summum
THE PRINCIPLE OF VIBRATION
"Nothing rests; everything moves; everything vibrates."-Summum
THE PRINCIPLE OF OPPOSITION
"Everything is Dual; everything has an opposing point; everything has its pair of opposites:

1999, the City Attorney responded to Summum, requesting 30–45 days "to research various issues before providing a substantive response . . . ." Treating the March 9, 1999 letter as a denial, on March 11, 1999, Summum and Zefferer sued the City of Ogden, alleging violations of the First Amendment Speech, Establishment and Free Exercise Clauses and corresponding claims under the Utah Constitution. Summum and Zefferer seek monetary compensation, punitive damages and declaratory and injunctive relief as well as attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. (See Complaint, Civil No. 1:98–CV–0031J, filed March 11, 1999 (dkt. no. 1), at 2, 17.)

The City Council instructed the City Attorney to decline the proposed donation and to explain their rationale for it in a letter to Mr. Barnard. The letter, dated July 26, 1999, states:

> On July 20, 1999, the Ogden City Council considered the Summum religion's proposal to donate a monument containing an inscription of Summum's fundamental religious principles and, as a condition of the donation, require the City to display it among the other City-owned monuments on the Municipal Grounds. For the reasons set forth below, the City declines to accept the gift.
>
> Ogden City has decorated its Municipal Grounds with a number of permanent monuments that were gifted by various people and organizations or were acquired with City funds. The monuments have cultural and precedential significance and memorialize historical and cultural events and ideas associated with the area, its settlement and development. The City owns each monument in the gallery, regardless of its origin, and has adopted the inscriptions as expressions of the City. The monuments in the Gardens represent views that are consonant with the City's views. Otherwise, the City would remove the monuments. Thus, the City has reserved for specific government purposes the use of its monuments on the Municipal Grounds. The City has never permitted the permanent placement of privately owned monuments on the Municipal Grounds, and never would.
>
> Summum's proposed monument does not fall within the purposes for which the City has reserved the forum and for which the City has historically accepted and displayed such gifts.
>
> The City also runs a substantial risk of violating the Establishment Clause if it accepts the gift and displays it on the Municipal Grounds. The City is obliged to comply with the Constitution's prohibition against state establishment of religion. Where the proposal is that the monument becomes the property and, in effect, the expression of the City, displaying a religious entity's religious message permanently on the Municipal Grounds could confer an imprimatur of

like and unlike are the same; opposites are identical in nature, but different in degree; extremes bond; all truths are but partial truths; all paradoxes may be reconciled."-Summum

THE PRINCIPLE OF RHYTHM
"Everything slows out and in; everything has its season; all things rise and fall; the pendulum swing manifests in everything; the measure of the swing to the right is the measure of the swing to the left; rhythm compensates."-Summum

THE PRINCIPLE OF CAUSE AND EFFECT
"Every Cause has its Effect; every Effect has its Cause; everything happens according to Law; Chance is just a name for Law not comprehended; there are many fields of causation but nothing escapes The Law."-Summum

THE PRINCIPLE OF GENDER
"Gender is in everything; everything has its Masculine and Feminine Principle; Gender manifests on all levels."-Summum

PRESENTED TO OGDEN CITY & WEBER COUNTY BY SUMMUM 1999

state approval on religious sects or practices, foster or encourage an impression that the monument speaks for the City, creating a plausible fear that the monument's religious orientation would be attributed to the City, and create a real likelihood the speech in question would be interpreted as being either endorsed or coerced by the City, all in violation of the Establishment Clause.

(Exhibit 1, Second Affidavit of Norman L. Ashton, filed July 30, 1999 (dkt. no. 48)).

## II. The History of the Eagles' Donated Monument

The Eagles' donated monument was one of several such gifts to state and local municipalities as part of an organized National Youth Guidance Program sponsored by the Fraternal Order of Eagles (the "Eagles") during the 1960s. A complete and thorough recitation of the history and rationale for the Eagle's gift campaign of monuments containing the "Ten Commandments" on public property is set out in *State v. Freedom From Religion Foundation, Inc.,* 898 P.2d 1013 (Colo.1995), beginning at page 1017 and again in *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 294–95 (7th Cir.2000). Besides the recitation of the history at the foregoing citations, it is worth noting a few salient facts associated with the creation of the monuments and the placement of the monument in the present case.

The gift of the Eagles' monument was inaugurated by E.J. Ruegemer, a Minnesota juvenile court judge, in 1943. Judge Ruegemer believed that it would be worthwhile to demonstrate to youths coming into contact with the courts that there were "long recognized codes of behavior to guide and help them." *Freedom From Religion Foundation, Inc.,* 898 P.2d at 1017. The judge, however, made it clear that such exposure to the Ten Commandments was not intended as a religious instruction of any kind. *Id.*

Judge Ruegemer, as chair of the Eagles' Youth Guidance Committee, presented his ideas to the Eagles for financial support. The Eagles initially declined to sponsor the initiative because it "might seem coercive or sectarian." *Id.* However, after representatives from the Jewish, Protestant, and Catholic faiths developed "a version of the Ten Commandments which was not identified with any particular religious group, [ ] the Eagles agreed to support such a youth guidance program." *Id.* Accordingly, various local chapters of the Eagles "paid for the stone monuments and donated them as part of the youth guidance program to several local and state governments," including the City of Ogden. *Id.*

In May 1966, the Ogden Fraternal Order of the Eagles donated the "Ten Commandments" monument to the Ogden City Council and Weber County Commission. Mayor Bart Wolthuis and Weber County Commissioner Favero accepted the monument as a gift in 1966 as an official act of government. The monument was jointly owned by Ogden City and Weber County for a period of time until Ogden City became the sole owner.

Mayor Wolthuis stated that he viewed the Ten Commandments, as presented, as a code of conduct that the City would adopt. (*See* Affidavit of Bart Wolthuis (dkt. no. 45), at 2–3.) He understood that the Eagles was not a religious organization; he did not view its members as particularly religious and he did not identify its members with any religious organizations or religion in general. *See id.* In his mind, religion was very far removed as a purpose for accepting the gift, and he viewed the gift's contents more as a code of moral and legal conduct rather than as a religious declaration. *See id.* In addition, he stated that when he accepted the monument, he believed that the monument be-

came the sole and exclusive property of the County and the City. *See id.*

## III. The Ogden Monument

The monument is located in the Municipal Gardens, which are located on the grounds north of the Ogden City Municipal Building. The monument is permanently installed in the grass some distance from the building itself, and is placed among other monuments, many of which are more prominent.[5] While the monument is visible from the sidewalk, there is no walkway leading to the monument and no bench for passersby.

Much like the monuments at issue in the foregoing cases, the "Ten Commandments" monument located in the Ogden Municipal Gardens is made of granite and is approximately 32 inches by 60 inches. It is sculpted in the form of two tablets. At the top of each tablet a floral design appears surrounding the representation of two smaller tablets. Inside the smaller tablets are Phoenician letters which form no intelligible words in that or any known language. Between the two smaller tablets appears an eye contained within a pyramid, commonly known as the "all-seeing eye" similar in representation to that which appears on the one-dollar bill. Just below the pyramid appears an eagle, which is grasping the American flag. The tablet reads:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbors.[6]

Below the script, at each corner is a star of David. In the center and at the bottom of the script are two Greek letters, Chi ($\mu$) and Rho ($\chi$), superimposed one on the other. The letters are the first two letters in the name "Jesus Christ" as rendered in Greek. Just below the two letters is a representation of a scroll upon which the following is inscribed:

PRESENTED TO THE CITY OF OGDEN AND WEBER COUNTY UTAH, BY UTAH STATE AERIE FRATERNAL ORDER OF EAGLES

1966

Other than the affidavit of Bart Wolthuis, the mayor who accepted the monument on behalf of Ogden City, not much documentation concerning the placement of the Eagles' monument exists.

---

5. A least six other monuments are located in the Ogden Municipal Gardens commemorating historical, secular and cultural figures and events associated with the area.

6. In an effort to articulate a non-sectarian expression of the Ten Commandments, the authors of the monument list as many as twelve separate statements as the Ten Commandments. *See* A. Powell Davies, *The Ten Commandments* 69 (1956). Also, the inscriptions on the monument are reproduced here as they appear on the actual monument itself.

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Standard of Review

Both parties in this action moved for summary judgment pursuant to Fed. R.Civ.P. 56. Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hom v. Squire,* 81 F.3d 969, 973 (10th Cir.1996). Courts must view the facts in the light most favorable to the non-moving party, but to avoid summary judgment that party must identify sufficient evidence that would require submission of the case to a jury. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hom,* 81 F.3d 969. "It is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative.'" *Jensen v. Redevelopment Agency of Sandy City,* 998 F.2d 1550, 1555 (10th Cir.1993) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

### II. Plaintiff's First Amendment Claims

■ The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech ...." The Fourteenth Amendment imposes these substantive limitations on the legislative power of the States and their political subdivisions. *See Wallace v. Jaffree,* 472 U.S. 38, 49–50, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

#### A. Free Speech Claim

There are three issues before this Court. The first issue is whether the City of Ogden can be compelled to accept a gift of a stone monument with Summum's religious tenets displayed thereon as an exercise of free speech guaranteed by the First Amendment.

■ The protections afforded private speech on government property depends upon the nature of the forum the government has created. *See Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Summum v. Callaghan,* 130 F.3d 906, 913 (10th Cir.1997). "The First Amendment does not guarantee access to property simply because it is owned or controlled by the Government." *Cornelius* at 803, 105 S.Ct. 3439.

[3] Here, the City of Ogden owns each monument regardless of its origin and it has adopted the inscriptions located thereon as its own expressions. The testimony of City officials so indicates. The Court finds that the City has properly reserved the use of monuments in the Municipal Gardens for a specific official use. *See Summum,* 130 F.3d at 916 (citations omitted). (*See* Mecham Depo. pp. 8, 10, 25–27, 39 Exhibit C to Defendant's Memorandum in Support of Motion for Summary Judgment, filed July 30, 1999 (dkt. no. 47).) As such, the forum in the Ogden Municipal Gardens remains non-public and the City cannot be compelled to accept monuments that do not constitute expressions of the City. Absent expression by any other speaker, the forum remains non-public.

Furthermore, Plaintiffs are not seeking to speak at the Municipal Gardens, hold a rally or a parade, hand-out leaflets, or to place a temporary banner. Rather, Plaintiffs are seeking to place a large, permanent and City-owned monument in the Mu-

nicipal Gardens. Plaintiffs would enlist this court's aid in dictating the City's own expression.

The fact that no policies were in place to allow the public to donate monuments, and the fact that there is no formal appeal process for the denial of such a request, evidences that the City never intended to open the forum to the public or to any speakers other than itself. The Court finds that the forum remains non-public.

■ Even if, however, the forum is deemed to be a limited public forum, this Court finds that the rejection of the proffered gift was reasonable.

## B. Establishment Clause Claim

■ The second issue before the Court is whether the City of Ogden violated the Establishment Clause of the First Amendment when it adopted the expressions located on the monuments in the Municipal Gardens, particularly the text on the monument donated by the Eagles [7] and at the same time rejecting Summum's proffered gift to erect and display a permanent monument containing its own religious expressions.

A stone containing twelve tenets, identical in nature to that of the Fraternal Order of Eagles, and donated by the same organization to Salt Lake City was examined by the Tenth Circuit Court of Appeals in *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir.), *cert. denied.* 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973), in which it characterized that roster of statements as secular in nature.

In *Summum*, the Tenth Circuit Court of Appeals questioned in passing the continued validity of its holding in *Anderson*— that the "Ten Commandments" monolith is primarily secular in nature—but stopped

short of overruling *Anderson.* *See Summum*, 130 F.3d at 911 n. 6. *Anderson* thus, is still good law and this Court is disciplined and bound by *Anderson.* Consistent with *Anderson*, this Court holds that the City of Ogden did not violate the Establishment Clause by adopting and displaying the "Ten Commandments" monument donated by the Eagles.

In contrast to accepting a non-sectarian gift from a secular group, had the City of Ogden accepted and adopted a gift from an admittedly religious organization wishing to promote a sectarian message in the Municipal Gardens, such would easily be seen to be an endorsement of religion and would have violated the Establishment Clause. It would have breached the strong but invisible wall of separation between church and state.

Apart from considerations of *stare decisis*, the Tenth Circuit Court of Appeals' holding in *Anderson* was rooted in a sound understanding of history. As the *Anderson* court noted, the Ten Commandments is at one and the same time, a secular symbol and an ecumenical symbol. *See Anderson*, 475 F.2d at 33. *See also* A. Powell Davies, *The Ten Commandments* 126 (1956). The "Ten Commandments," while a sacred text to some and an ethical code of conduct to others, is also a landmark in the history of the development of Western law. Because they have generally been characterized in history as a "religious text" does not change their secular history. Indeed, many great civilizations have premised their theory of law as being divinely inspired. For example, the pillar-code of Hammurabi, the foundation of law in Babylonia, is said to have been delivered to King Hammurabi by Shamash, the Sun God–God of law. John H. Wigmore, *A Panorama of the World's Legal Systems*,

---

**7.** For while the propositions have various histories and various forms, they are most often  called the "Ten Commandments."

88 (1928). The Hindu Code of Manu is said to have been authored by the divine hand. *See id.* Even as recently as the Second World War, the Japanese believed their Emperor to be a descendant of God. The Pledge of Allegiance, as adopted by Congress, purports to pledge allegiance to "one nation, under God, indivisible, with liberty and justice for all" and is said by most school children in public schools, sometimes every day. *See West Virginia State Board of Education, et al., v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Blackstone wrote that "the law of nature ... dictated by God himself ... is binding ... in all countries and at all times; no human laws are of any validity if contrary to this; and such of them as are valid derive all their force, and all their authority, mediately or immediately, from this original." W. Blackstone, 1 *Commentaries,* 41 (1765), *reprinted in* Harold J. Berman, *Religion and Law: The First Amendment in Historical Perspective,* 35 Emory L.J. 777, 789 (1986). The fact that our own U.S. Congress opens every morning it is in session with a prayer, and the fact that our courts make reference to God in opening the day's session and in oaths, pays homage to the evolving history of law.

Indeed, the very words that many are trying to eradicate from the governmental domain were included deliberately to demonstrate our nation's recognition of God. The country's coinage began reflecting references to God in 1864 at the direction of the Secretary of the Treasury, Salmon P. Chase, after receiving a letter from the Reverend M.R. Watkinson of Pennsylvania. Watkinson suggested in his letter that the Union risked being misinterpreted by posterity absent a public recognition of God on our nation's coinage. Watkinson, wrote, "What if our Republic were now shattered beyond reconstruction? Would not the antiquaries of succeeding centuries rightly reason from our past that we were a heathen nation?" Chase directed the U.S. Mint to declare a national recognition of God to be included on our national coins. "In God We Trust" became the new motto at his suggestion. *See* Brian Burrell, *The Words We Live By* 189 (1997).

According, to the traditional story, the "Ten Commandments" are said to have been handed down to Moses by Jehovah on Mount Sinai. John H. Wigmore, *A Panorama of the World's Legal Systems* 105 (1928). Moses himself claimed no divine properties which would have set him apart from other mortals; nor are there any stories of miraculous conception or birth as exist around other figures of religious significance, such as Jesus, Buddha, or Zarathustra.[8] *The Viking Portable World Bible* 219 (Robert O. Ballou ed.1944).

Several versions of the Ten Commandments, also known as the Decalogue,[9] exist, and indeed at least two versions are found in the Pentateuch[10] of the Bible

---

**8.** "There were no voices of angels singing to herald the coming of the great Hebrew leader, no moving star or other phenomena of nature to lead shepherds and wise men to the bed of the child, no bending down of trees over the mother, as in the story of the birth of the Buddha, no luminosity about the place of accouchement, such as that which we are told shone about Zarathushtra's birthplace three days before his birth. There were no prophets either at his birth or during his childhood to proclaim his divinity." *The Portable World Bible* at 219.

**9.** Correctly translated from Hebrew, the "Ten Commandments" is actually the "Ten Words." Further translated into Greek from Hebrew, the term *Decalogue* is the accurate translation of the original Hebrew. *See The Ten Commandments* at 69.

**10.** The Pentateuch is the Five Books which comprise the Torah or Ancient Law. The Pentateuch served as the foundation for the Hebrew legal system from roughly 1200 B.C. to 300 B.C. *See The Panorama of the World's Legal Systems* at 104 and 107. Commenta-

itself. Other versions are found elsewhere. To the extent that the Decalogue serves as a religious symbol, various religions recognize different versions and arrangements of the Decalogue.[11]

None of the versions of the Decalogue identified with a particular religious group appears on the monument at the Ogden Municipal Building. As a result, no specific religious group or religious text is identified with the "Ten Commandments" and the version of the "Ten Commandments" on the monument is but a symbol. The versions, while distinct in their presentation, rationale and numbering, are similar with regard to general content. The commandments are basic policy statements and general principles, involving both one's relationship to God and one's relationship to family and neighbors. The varying texts and rationale used to articulate the "Ten Commandments" and its location in the Pentateuch serve to illustrate the secular nature of the "Ten Commandments," the considerable influence other older codes had on it, and its influence on western legal systems.

tors suggest that the Pentateuch was derived in part from the Code of Hammurabi. *See The Ten Commandments* at 72–73. Interestingly, Hammurabi preceded Moses by almost four centuries. *See id.*

The two versions of the Decalogue can be found in the Pentateuch in the book of Deuteronomy at chapter v and in the book of Exodus at chapter xx. The notable differences between the two versions found in the Pentateuch are:

(1) In the Fifth commandment, Exodus connects long life with the duty of honoring the father and the mother and does not speak of any other recompense, whereas [Deuteronomy] adds "that it may go well with thee upon the land which Yahweh, thy God, giveth thee." (2) In the Tenth commandment, [Deuteronomy] warns first against coveting one's neighbor's wife, where Exodus gives "house," and to the categories of things not to be coveted [Deuteronomy] adds "field." The most striking difference, however, is in the Fourth commandment. In Exodus the basis for sabbath observance is that God "made heaven and earth, the sea, and all that in them is, and rested the seventh day; wherefore the Lord blessed the sabbath day, and hallowed it." In Deuteronomy we have quite a different basis. The sabbath is to be observed "that thy manservant and thy maidservant may rest as well as thou. And thou shalt remember that thou wast a servant in the land of Egypt, and the Lord, thy God, brought thee out thence by a mighty hand and by stretched-out arm; therefore the Lord, thy god, commanded thee to keep the sabbath day."

*Id.*, at 71–72.

The first printed English translation of the Pentateuch from Hebrew was completed by William Tyndale in 1530. Even this early translation manifests different versions of the "Ten Commandments" from the modern-day Pentateuch, with differences resulting between the two versions found within the Pentateuch itself. For instance, the Exodus version reads, "Thou shalt have none other gods in my sight," while the Deuteronomy version reads, "Thou shalt have therefore none other gods in my presence." *See* David Daniell, *Tyndale's Old Testament* 116, 265 (1992).

11. For instance, "[t]he first statement, 'I am the Lord thy God, which brought thee out of the land of Egypt, out of the house of bondage,' is counted as a preface by the Greek and Reformed Churches, as it is by the Roman Catholic and Lutheran; but in the Jewish communion it is counted, as the First Commandment. The prohibition, 'Thou shalt have no other gods before me' is given as the First Commandment in the Greek and Reformed Churches but it is combined with the prohibition of 'graven images' by the Roman Catholic and Lutheran churches to make one Commandment, whereas in the Jewish communion the same combination of the two prohibitions makes the Second Commandment." In addition, "[t]he Greek, Reformed and Jewish commandments Three to Nine become the Roman Catholic and Lutheran Two to Eight, and the Tenth commandment of the former group is divided into two by the latter. But the division is not the same—the Roman Catholic Ninth Commandment protects in the first place the neighbor's wife, the Lutheran, his house." *See The Ten Commandments* at 69.

Many have declared Moses to be the "supreme lawmaker" of all time. *See id.* Indeed, even one legal commentator noted, "[the] Ten Commandments, on the two tablets of stone, were the greatest short moral code ever formulated ...." Wigmore, *supra,* 105. One humble scholar notes the following:

> To the extent that Sinai does not represent as much of a dramatic break with the past as a culmination of a long process of development, it reflects not only the history of law, but its historiography as well. We tend to look back at great moments, such as the Magna Carta and the American Constitution, as if they were dramatic breaks with the past. Careful study, however, often discloses that they were actually the inevitable and predictable culminations of developments over time. Because historians crave landmarks and watersheds, they often exaggerate the significance of dramatic singular events that are the culminations of a long, gradual process of adumbration. Magna Carta, for example, summarized and codified developments that were already recognized as part of the common law. Once we had Magna Carta, it became less important to focus on the prior Year Books in order to extract from them the principles that would come to be codified in the great charter.
>
> This is not to trivialize the dramatic moments historians count as significant. It is to understand that these moments do not arise out of nothingness. In history there is never a tabula rasa. We always write on a tableau on which much has already been written, erased, and re-written—even if the tableau is oral.

Alan M. Dershowitz, *The Genesis of Justice* 246 (2000). In his essay, Dershowitz points out that in some texts of the "Ten Commandments" are often called the "Ten Statements." *See id.*

We would take a myopic view of history if we denied that our laws did not have early roots with an origin which some believed divine. The fact that various versions of the "Ten Commandments" are thought by some to be of divine origin ought not to deprive those who place emphasis on its secular origins—including the City of Ogden—of a chance to have their say. Religious groups do not have an exclusive claim to that code of conduct. It belongs to us all.

## C.  Free Exercise Claim

■■ The third issue before this Court is whether Defendants violated the Free Exercise Clause of the First Amendment. To succeed on a Free Exercise claim, Plaintiffs must show that the government substantially burdened a truly held mode of religious exercise or practice. Here, the City of Ogden did not accept and display the proposed monument on publicly-owned property. Defendants assert that Plaintiff has no truly held religious belief or practice requiring it to donate monuments to Ogden City to be accepted and placed on public property. (*See* Memorandum in Support of Defendant's Motion for Summary Judgment, filed July 30, 1999 (dkt. no. 47), at 57). Defendants' assertion goes uncontroverted. The Court holds that Defendants have not violated Plaintiff's Free Exercise rights as guaranteed by the First Amendment. Plaintiffs remain free to explore the nature and origins of the universe unhindered by Ogden City.

In light of the foregoing, the Court declines to exercise jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

## III.  Conclusion

In summary, the forum Plaintiffs seek to use is non-public.

The Eagles' monument is primarily "secular" as previously determined by the

**1298**

Court of Appeals, with no power in this Court to find otherwise; for historical reasons, ancient, as well as contextual to this case, the Court has no reason to find otherwise.

Had the City of Ogden received and adopted Plaintiffs' proffered gift as its own expression as Plaintiffs would insist, the Establishment Clause of the United States Constitution would be violated. Therefore,

**IT IS ORDERED** that Plaintiffs' Motions are DENIED.

**IT IS FURTHER ORDERED** that Defendants' Motion is GRANTED.

Let judgment be entered accordingly.